## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | |
| **MARK HOUCK** | : | **NO. 2:22-cr-00323-GJP** |

### ORDER

And now, this _____ day of _____, after reviewing the submissions of the Government and Defense Counsel, and a hearing on this matter;

It is hereby **ORDERED** that Defendant's Motion to Dismiss is **GRANTED**, and both Counts of the Government's Indictment, brought under 18 U.S.C. §248 and based on allegations against Defendant Mark Houck for incidents that occurred on October 13, 2021, are **DISMISSED WITH PREJUDICE**.

BY THE COURT:

_____
**THE HONORABLE GERALD J. PAPPERT**
**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | |
| **MARK HOUCK** | : | **NO. 2:22-cr-00323-GJP** |

## DEFENDANT'S MOTION TO DISMISS FOR VIEWPOINT DISCRIMINATION & SELECTIVE PROSECUTION, VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT & FREE EXERCISE CLAUSE, LACK OF JURISDICTION, AND LACK OF SPECIFIC INTENT

The Government has filed two brazenly defective and discriminatory charges against Mark Houck under the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, and both should be dismissed.

Count One of the Indictment alleges that Mr. Houck, whom the Government categorically deems a "protestor," "shoved" Mr. Love, whom the Government categorically deems a "volunteer patient escort," as Mr. Love "attempted to escort two [Planned Parenthood] patients." But the Indictment blatantly omits that, indisputably, any physical contact occurred outside a pregnancy resource center *across the street* from the abortion facility approximately 100 feet away, and only once Mr. Love had overtaken and obstructed Mr. Houck—in violation of FACE—as Mr. Houck attempted to direct the two women into the pregnancy center.

Count Two alleges that on the same day, Houck "verbally confronted Mr. Love and forcefully shoved" him to the ground "in front of the" abortion facility. But again, the Government brazenly ignores that, again indisputably, it was Mr. Love who approached and verbally confronted Mr. Houck and his then-12-year-old son *approximately 50 feet away* from the abortion facility's entrance, and who turned directly into Mr. Houck after Mr. Houck directed him to get away. Only then did Mr. Houck shove him away.

Meanwhile, the Government has refused to prosecute Mr. Love for his direct obstruction of Mr. Houck as part of the facts giving rise to Count One. Additionally, the Government has altogether failed to prosecute more than 150 acts of physical damage and destruction inflicted on pregnancy resource centers and churches across the country—in express violation of FACE—since the leak of the Supreme Court's draft opinion in *Dobbs v. Jackson Women's Health Organization* in May 2022. Yet it has filed FACE charges against no fewer than 26 *pro-life individuals* in 2022— exponentially higher number than anytime in recent history, while prominent and nationwide pro- abortion FACE violations remain unpunished.

Therefore, Mr. Houck moves to dismiss both Counts because they blatantly violate (1) constitutional guarantees against viewpoint discrimination and selective enforcement; (2) the constitutional guarantees against content-based discrimination; (3) the Religious Freedom Restoration Act and the Free Exercise Clause (since Houck's activities were religious motivated); (4) FACE's own requirement that defendants act with the *specific* intent of both injuring, intimidating, or interfering a covered individual, *and* with the specific intent of doing so *because* the person is "providing reproductive health services"; and (5) requisite federal jurisdiction since Congress lacks power to apply FACE to such non-economic conduct that is purely a matter of state and local law.

WHEREFORE, defendant Mark Houck respectfully requests that the motion to dismiss both Counts of the Indictment be granted.

**Respectfully submitted,**

**s/BRIAN J. MCMONAGLE**
**BRIAN J. MCMONAGLE, ESQUIRE**

## CERTIFICATE OF SERVICE

BRIAN J. MCMONAGLE, Esquire hereby certifies that a true and correct copy of the foregoing document has been electronically filed.

<u>**s/ BRIAN J. MCMONAGLE**</u>
**BRIAN J. MCMONAGLE, Esquire**

**DATED: 12-5-22**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| MARK HOUCK | : | NO. 2:22-cr-00323-GJP |

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS FOR VIEWPOINT DISCRIMINATION AND SELECTIVE PROSECUTION, VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT AND FREE EXERCISE CLAUSE, AND FOR LACK OF JURISDICTION

In the teeth of over 150 uncharged incidents of destruction and vandalism at pro-life centers and churches across the country, the U.S. Department of Justice has instead haled Mark Houck into court for two alleged violations of the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248, which occurred on a public sidewalk outside a Philadelphia Planned Parenthood abortion facility. The DOJ has demonstrated clear and illegal hostility to the pro-life viewpoint in its statements and enforcement decisions, running roughshod over fundamental religious freedoms, free speech rights, and bringing an illegal selective prosecution here.

Moreover, there is no general police power delegated to the federal government under the U.S. Constitution. Yet, a general police power is what the Government seeks to exercise here, indicting Mr. Houck for actions that lack any federal jurisdictional nexus and that are, *at most*, a matter of state law. Application of FACE to Mr. Houck exceeds the bounds of any powers granted to the federal government by the Constitution and offends both principles of federalism and the Tenth Amendment.

Therefore, Mr. Houck respectfully asks that the indictment be dismissed with prejudice for the reasons explained more fully below.

## FACTUAL ALLEGATIONS

The Indictment alleges two violations of FACE occurring on October 13, 2021. (*See* D.E. #1: Indictment.) Neither incident has any connection to the provision of "reproductive health services" by Bruce Love, an alleged "volunteer patient escort" at the Philadelphia Planned Parenthood abortion facility at 1144 Locust Street.

In the incident alleged as Count One of the Indictment, two women had left the abortion facility and proceeded west on Locust Street. They encountered Mr. Houck, at the corner of 12th Street, about 50 feet away from the entrance to the abortion facility, and began a conversation. The three proceeded across 12th Street, toward a nearby pregnancy resource center, roughly 100 feet away from the abortion facility entrance. Mr. Love saw the three conversing and left his post at the abortion facility entrance to "intercept" them. (Interview Notes from Interview of Anthony Farnan[1], 3/21/22, USAO0000118.) Near the pregnancy center, Mr. Love overtook the three and positioned himself to obstruct Mr. Houck from proceeding, with Mr. Love alleging that Mr. Houck "told Love to get out of the way." (Interview Notes from Interview of Bruce Love, 3/21/22, USAO0000109.) The two made contact, with Mr. Love falling to the ground. The contact is described by the indictment as a "shove," though Mr. Love himself described the altercation as Mr. Houck "grabbing his arm" and another witness described it as a "hip check."

The indictment omits the key fact of where this interaction occurred: in front of the pregnancy resource center that Mr. Houck counsels toward, and not the abortion facility where patients may have an alleged need to be "escorted" by Mr. Love. (*See id.* at Count One ¶ 5.)

---

[1] Despite being interviewed twice by the Government and being an eyewitness to the incidents alleged in Counts One and Two, Mr. Farnan was not presented to the Grand Jury.

In the incident alleged in Count Two of the indictment, Mr. Houck and his then-12-year-old son were standing at the corner of 12th Street, 50 feet away from the abortion facility entrance and well away from Mr. Love. One witness alleges that Mr. Houck "did not want to be near [Mr. Love] because Love may try and provoke him." (Farnan, 3/21/22, USAO0000118.) Mr. Love left his post at the abortion facility entrance and walked over to the pair. According to Mr. Love, he "normally does not walk to that corner but because Houck was there that day Love did." (Interview Notes from Interview of Bruce Love, 1/5/22, USAO0000080.) There were no facility patrons in the area. According to Mr. Love, Mr. Houck told him to "Stay away from me and stay away from my son." (Love, 3/21/22, USAO0000109.) An altercation ensued and Mr. Houck is alleged to have shoved Mr. Love to the ground.

The government fails to allege that the incident occurred while Mr. Love was providing "reproductive health services," alleging instead only that the incident occurred "in front of" the Planned Parenthood abortion facility. (*Id.* at Count Two ¶ 2.)

After the incidents, Mr. Love brought a private criminal complaint[2] against Mr. Houck with the Philadelphia District Attorney's Office. In Philadelphia, once a private criminal complaint is made the parties are asked to agree to mediation. Mr. Love refused mediation and thereafter the case was transferred to the Philadelphia Municipal Court for a trial on criminal charges. Ultimately, the charges were dismissed when Mr. Love repeatedly failed to appear for trial.

Then, on April 27, 2022, Assistant United States Attorney Anita Eve sent a target letter to Mr. Houck. Mr. Houck's counsel, former longtime federal prosecutor Matt Heffron, Esq., called and left messages with AUSA Eve. When he received no response, Mr. Heffron sent an email to

---

[2] Mr. Love omitted any mention of the incident alleged in Count One in his private criminal complaint.

AUSA Eve, in which he agreed to accept a summons on Mr. Houck's behalf and to self-surrender him in the event of indictment. He did so in order to avoid armed police officers having to come to Mr. Houck's residence, where he lives with his wife and 7 young children. Despite this good faith request, on September 23, 2022, dozens of heavily armed state police and federal agents descended on Mr. Houck's home and took him into custody. Mr. Houck's wife and children were traumatized by this unnecessary show of force.

## LEGAL STANDARD

"[A]n as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'" *United States v. Huet*, 665 F.3d 588, 600-01 (3d Cir. 2012) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citation omitted)).

"A motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2). If an indictment does not allege a federal offense, the Court lacks jurisdiction, and the indictment may be dismissed. *See United States v. Spinner*, 180 F.3d 514, 516 (3d Cir. 1999) ("'failure of an indictment sufficiently to state an offense is a fundamental defect . . . and it can be raised at any time'") (quoting *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)); *see also United States v. Freeman*, 813 F.2d 303, 304 (10th Cir. 1987) ("It is well established . . . that the failure of an indictment to state an offense is a fatal defect that may be raised at any time.").

## ARGUMENT

## I.  SELECTIVE ENFORCEMENT AND VIEWPOINT DISCRIMINATION.

FACE is unconstitutional as applied here to Mr. Houck. "Although prosecutors enjoy wide discretion," they violate the guarantee against selective enforcement by "prosecut[ing] based on a

defendant's 'race, religion, or other arbitrary classification.'" *United States v. Gist*, 382 F. App'x 181, 183 (3d Cir. 2010) (unpublished) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)); *see* Fed. R. Crim. Proc. 12(b)(3)(A)(iv) (selective or vindictive prosecutions are grounds for pre-trial dismissal). Moreover, the Government may not act based on its "disapproval of a subset of messages it finds offensive," as "[t]his is the essence of viewpoint discrimination." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring).

The Government has done both here. The Government has simultaneously turned a blind eye to *Mr. Love's* direct obstruction of Mr. Houck's *pro-life* "reproductive health services" in Count One, and the Government committed numerous procedural improprieties in doing so. In particular, the Government has affirmatively obfuscated the fact that Mr. Love blocked Mr. Houck's path as Mr. Houck attempted to walk two women to the pregnancy center 100 feet away from Planned Parenthood (the same two women the Government misleadingly refers to in Count One), in direct violation of FACE. *See Terry v. Reno*, 101 F.3d 1412, 1419 (D.C. Cir. 1996) (FACE "does not play favorites" as it protects both "abortion clinics" and "facilities providing pre-pregnancy counseling services"); *see also United States v. Scott*, 958 F. Supp. 761, 773 (D. Conn. 1997) (FACE protects those on sidewalks "who are assisting patients . . . in obtaining access to the clinic") (citing S. Rep. No. 103-117, at 26).

Moreover, the Government has thus far refused to prosecute *any* of the more than 150 incidents of violence against pro-life pregnancy centers and churches nationwide in the wake of the leak and publishing of *Dobbs*.[3] *See Riely v. Reno*, 860 F. Supp. 693, 702 (D. Ariz. 1994) (FACE

---

[3] Mary Margaret Olohan, "DOJ's Kristen Clarke: A Pro-Abortion Activist Enforcing the Law Against Pro-Lifers," The Daily Signal, Oct. 26, 2022, https://www.dailysignal.com/2022/10/26/dojs-kristen-clarke-pro-abortion-activist-enforcing-law-pro-lifers/; *see* Fed. R. Ev. 201(b)(2) (courts may take judicial notice of facts that are "not subject

"would apply to an individual who spray paints the words 'KEEP ABORTION LEGAL' on a facility providing counseling regarding abortion alternatives"). Accordingly, the Government's refusal to apply FACE to pro-choice/abortion individuals like Mr. Love, while simultaneously and aggressively applying it to pro-life individuals like Mr. Houck—*and more than 20 other pro-life individuals in 2022*[4]—is unconstitutionally selective and viewpoint discriminatory.

### A. Selective Enforcement And Viewpoint Discrimination Are Overlapping But Distinct.

Selective enforcement "violates the right to equal protection," *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989), while viewpoint discrimination "is a First Amendment challenge," *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). "Although there can be overlap between a 'viewpoint discrimination' claim under the First Amendment and a 'selective enforcement' claim under the Equal Protection Clause of the Fourteenth Amendment" (or the Fifth Amendment), they are distinct violations. *Berg v. Village of Scarsdale*, 2021 WL 5751385, at *3 (2d Cir. 2021).

To be sure, "[a]ctivities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message." *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000). But "an erroneous application of F.A.C.E. threatens to impinge First Amendment activity." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001). And where enforcement is based not on physical conduct alleged in the indictment, but on the government's "disapproval of a subset of messages it finds offensive," *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring), the Constitution prohibits it. *See Scott*, 958 F. Supp. at 774

---

to reasonable dispute" because they can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[4] *Id.*

("Conduct may be regulated . . . as long as it is not regulated *because* of [the person's] viewpoint.") (emphasis added).

> **B.**     **The Government's Procedural Improprieties Demonstrate Selective And Vindictive Enforcement.**

To dismiss for selective prosecution, the defendant must make a "credible showing," *Armstrong*, 517 U.S. at 470, that "persons similarly situated have not been prosecuted and that the decision to prosecute was made on the basis of an unjustifiable standard." *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (internal quotations omitted). Even "some evidence *tending to show* the existence of the essential elements of the defense" allows the defendant "to obtain discovery on such a motion." *Id.* (emphasis added). Additionally, where the defendant "establish[es] the appearance of vindictiveness," the Government must show its decision was justified. *Schoolcraft*, 879 F.2d at 68. These standards plainly require dismissal here.

The evidence is that Mr. Love was the individual actually engaged in an obstruction in Count One, not Mr. Houck, and yet the Government here has indicted the pro-life victim rather than the pro-choice aggressor under FACE. Such blatantly discriminatory charging decisions flowing from the very same incident show that the Government is defining victims and defendants based on what they believe, not what they did, all in violation of the Constitution.

> **C.**     **The Government's "Pattern" Of Enforcement Only Against Pro-Life Individuals, And Not Pro-Abortion Violations, Violates The First Amendment.**

Moreover, the First Amendment prohibits "viewpoint discriminatory enforcement" where the Government has engaged in "a pattern of unlawful favoritism." *Brown v. City of Pittsburgh*, 586 F.3d 263, 293 (3d Cir. 2009) (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002)). To prevail, a defendant must show that "enforcement of the [law] has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another

7

(e.g., a pro-choice view)," and an "intent to discriminate on the basis of viewpoint." *Brown*, 586 F.3d at 293. In other words, the defendant prevails where "a pattern of enforcement activity *evinc[es]* . . . intentional discrimination on the basis of viewpoint." *Id.* at 294 (emphasis added). There is overwhelming evidence of exactly this sort of pattern here.

As noted, FACE protects both pro-choice and pro-life "reproductive health services." 18 U.S.C. § 248(e)(5) (broadly defined to include "counselling or referral services . . . relating to pregnancy or the termination of a pregnancy"). FACE also expressly prohibits "intentionally damag[ing] or destroy[ing]" both "the property of a facility . . . because such facility provides reproductive health services," and "the property of a place of religious worship." *Id.* § 248(a)(2); (e)(1).

Yet, the indisputable evidence shows that the Government, under the Biden Administration, has engaged in an overt pattern of aggressive enforcement of FACE against pro-life individuals, while turning a blind eye to blatant violations by pro-abortion individuals—even when pregnancy centers and churches have been *firebombed* and vandalized at far greater rates in the past year, *including in Philadelphia itself*, expressly because they promote abortion alternatives.

In 2022 alone, the Government has engaged in seven enforcements of FACE against a total of 26 individuals—all of whom are pro-life activists.[5] This number is significantly higher than FACE prosecutions in recent years, which included only four individuals in 2021, one in 2020, two in 2019, one in 2018, and nine total between 2011 and 2017.[6]

---

[5] Olohan, *supra* n.1; U.S.D.O.J., Civil Rights Division, "Recent Cases on Violence Against Reproductive Health Care Providers," https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers.

[6] *Id.*

Glaringly, the Government has thus far categorically refrained from enforcing FACE against *any* physical damage or destruction caused to no less than *98 Catholic churches* and *74 pregnancy resource centers* since the May 2022 leak of the draft opinion in *Dobbs*.[7] One of these facilities is HOPE Pregnancy Center in Philadelphia, which suffered four smashed windows and graffiti vandalism on or around June 11, 2022; soon after, an anonymous blog post claimed responsibility for the vandalism because, "We are tired of your 'family values' . . . [and] [t]his fake clinic spread lies and is part of a broader attempt to strip away body autonomy from hundreds of women and people."[8] This attack, and *more than one hundred fifty like it* around the country since May 2022, plainly violate the express terms of FACE. *See Riely*, 860 F. Supp. at 702. Yet *by the Government's own admission*, it has prosecuted exactly *zero* of these outrageous acts of violence to date.[9]

While the FBI has stated it is investigating at least some of these attacks, it has refused to say whether it is investigating them as violations of FACE; and DOJ has not said whether the FBI has referred any of these cases for prosecution.[10] Further, as two Congressman recently pointed out in a letter of inquiry to DOJ, there is no evidence of any similar over-the-top FBI raids with ballistic shields and long guns against pro-abortion violators (or any arrests at all, for that matter), even though Mr. Houck was made to suffer exactly such treatment for his conduct.[11]

---

[7] Olohan, *supra* n.1; *see also* Catholic Vote, *Tracking Attacks on Pregnancy Centers & Pro-Life Groups*, last updated Dec. 2, 2022, https://catholicvote.org/pregnancy-center-attack-tracker/; Catholic Vote, *Tracker: Over 240 Attacks on U.S. Catholic Churches Since May 2020*, https://catholicvote.org/tracker-church-attacks/.

[8] Joe Bukuras, "Another pro-life clinic attacked, this one in Philadelphia," Catholic News Agency, June 15, 2022, https://www.catholicnewsagency.com/news/251546/philadelphia-pro-life-clinic-vandalized.

[9] U.S.D.O.J., *supra* n. 3.

[10] Olohan, *supra* n.1.

[11] Mary Margaret Olohan, "EXCLUSIVE: Jim Jordan Launches Congressional Inquiry Into FBI Raid on Mark Houck, DOJ's Political Enforcement of FACE Act," Daily Signal, Oct. 7, 2022.

In short, this is precisely the kind of "pattern of unlawful favoritism" that "evince[s] . . intentional discrimination on the basis of viewpoint." *Brown*, 586 F.3d at 293-94; *see also Thomas*, 534 U.S. at 325 ("Granting waivers to favored speakers . . . would of course be unconstitutional."). Certainly the Government's recent enforcement of FACE has fallen far "more heavily on those who advocate . . . a pro-life view," even though the indisputable evidence confirms that "advocates of a [pro-life] viewpoint" do *not* "happen to engage in certain proscribed conduct more than those who espouse other views." *Id.* This easily "evinces" both disparate impact *and* intentional discrimination in violation of the First Amendment. It is also easily distinguished from cases where defendants or claimants pointed to no actual "evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs." *McGuire*, 386 F.3d at 65.

This evidence also fits well within the *Village of Arlington Heights* factors that courts often find "probative in determining discriminatory intent." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). Specifically, it shows a "consistent pattern" that "disparately impact[s] members of a particular class of persons," as well as "significant departures from normal procedures." *Id.* Indeed, one former high-ranking DOJ official recently stated (anonymously) that Mr. Houck's prosecution is "atypical" from previously FACE prosecutions, which usually "involve things like blowing up an abortion clinic, or threatening to blow up a clinic, serious violence or threats to bodily injury," not "something of th[e] nature that is alleged in the Houck case."[12] And in a letter of inquiry to the FBI, 12 Senators recently noted that the unusually

---

https://www.dailysignal.com/2022/10/07/exclusive-jim-jordan-launches-congressional-inquiry-into-fbi-raid-on-mark-houck-dojs-political-enforcement-of-face-act/.

[12] Olohan, *supra* n.1.

aggressive nature of Mr. Houck's arrest appeared to violate DOJ's own use-of-force policy.[13] Finally, despite twice interviewing witness Anthony Farnan, the Government did not present him to testify before the Grand Jury. His eyewitness testimony of the alleged incidents is clearly exculpatory and, based on a review of the FBI Interview reports tendered to the Defense, Farnan's recollection of the events was more specific and better matched the video evidence (which Farnan had not viewed) than that of Mr. Love. *See* DOJ Manual, 9-11.233, "Presentation of Exculpatory Evidence" (". . . when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person. . . . appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.").

Finally, on July 8, 2022, as part of an overall response to *Dobbs*, President Biden declared that "I'm asking the Justice Department . . . to do . . . everything in their power to protect these women seeking to invoke their right" to abortion; and "[i]n states where clinics are still open, to protect them from intimidation."[14] While not dispositive, these sorts of "contemporaneous statements" by relevant decisionmakers like President Biden, especially while failing to take any official action in response to the phenomenon of nationwide pro-abortion violence against

---

[13] Brianna Herlihy, "12 GOP senators demand explanation for FBI arrest of pro-life activist," Fox News, Sept. 28, 2022, https://www.foxnews.com/politics/12-gop-senators-demand-explanation-fbi-arrest-pro-life-activist.

[14] The White House, "Remarks by President Biden on Protecting Access to Reproductive Health Care Services," July 8, 2022, https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/08/remarks-by-president-biden-on-protecting-access-to-reproductive-health-care-services/.

pregnancy centers and churches since the *Dobbs* leak, are only more evidence of discriminatory intent.[15]

Accordingly, the Government's enforcement of FACE against Mr. Houck is manifestly viewpoint discriminatory, and the Indictment must be dismissed.

## II. THE GOVERNMENT'S INTERPRETATION OF FACE RENDERS IT INHERENTLY CONTENT-BASED.

The Government's application of FACE to Mr. Houck, who it deems a "protestor," but not to Mr. Love, who it deems a provider of "reproductive health services," also renders it discriminatory based on content. The indictment must be dismissed for this reason, as well.

The Supreme Court recently clarified that a regulation of speech is facially and *objectively* content based when it defines "regulated speech by a particular subject matter," or, "more subtle[ly]," when it regulates speech based on "its function or purpose," *even when there is no invidious intent. Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 165-66 (2015). Further, a law is content based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014).

Here, the Indictment categorically labels Mr. Houck "a protestor at PPC"—even though he counsels women to, and assists women in accessing, the nearby pregnancy resource center, 100

---

[15] Also notable is the recent pro-abortion political activism of U.S. Assistant Attorney General for the Civil Rights Division Kristin Clarke, who oversees prosecutions of FACE, and who—like much of the pro-abortion vandalism noted above—has called pregnancy care centers "fake clinics" and "predatory," and has also stated that pro-life groups represent the "anti-choice movement [that] will stop at nothing." Olohan, *supra* n.1; Chuck Ross, "Pro-Life Facilities Are Under Attack. A Top DOJ Official Called Them 'Fake Clinics.'," The Washington Free Beacon, June 15, 2022, https://freebeacon.com/biden-administration/pro-life-facilities-are-under-attack-a-top-doj-official-called-them-fake-clinics/. While these statements are not immediately contemporaneous, they are still probative in discerning the discriminatory nature of the Government's one-sided enforcement of FACE.

feet away and across the street from Planned Parenthood. *See* Indictment, ¶4; *see also, e.g.,* Farnham, 3/21/22, USAO0000118. At the same time, the Government categorically labels Mr. Love "a volunteer patient escort," even though in the incidents alleged here, (1) Mr. Love walked the 100 feet from the entrance to the abortion facility, and crossed 12th Street, proceeding to the pregnancy center, to "intercept" Houck and two women Houck was directing to the pregnancy center (Count One), *see id.*; *see also* Interview with "E.W.," March 21, 2022, USAO0000107; and (2) Mr. Love directly confronted *and himself "protested" against* Mr. Houck and his son on the corner of 12th and Locust Streets, roughly 50 feet away from the gates of the Planned Parenthood, *while not escorting any women* (Count Two).

As a result, the Government's determination that only Mr. Love, and not Mr. Houck, provides "reproductive health services" necessarily requires "examin[ing] the content of" their respective "messages," including their "function or purpose." Indeed, for purposes of this issue, the only material difference between Mr. Houck and Mr. Love (in seeking to assist women in entering different facilities covered by FACE) is the *content* of their speech (*i.e.*, their viewpoint). But the Government's determination that only one of them "provid[es] reproductive health services" renders the law content-based on its face, since the meaning of "providing reproductive health services," 18 U.S.C. § 248(a)(1), would turn simply on whether someone is providing pro-*life* or pro-*choice* services.

Under the canon of constitutional avoidance, this interpretation must be rejected. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). Given the consensus that FACE protects both pro-life and pro-choice providers of reproductive health services, *see supra*, and the fact Mr. Houck himself was attempting to help women access the pregnancy center across the street, it is more than "fairly possible," *see id.*, to construe Mr. Houck's relevant activities as "reproductive health

13

services"—at least as much as Mr. Love's activities could be characterized that way—without reference to the content of his message. If Mr. Love's activities are considered protected by FACE, Mr. Houck must also necessarily be protected by FACE, at least from being "intercept[ed]" by Mr. Love, as Houck was engaged with potential patrons in front of a pregnancy resource center, during the incident alleged in Count One. Regardless, Mr. Love should *not* be considered protected in "intercept[ing]" Mr. Houck 100 feet away and across the street from the abortion facility entrance during the incident alleged in Count One, nor when Love was protesting Mr. Houck and his son with no patients around and 50 feet away from the abortion facility entrance during the incident alleged in Count Two.

Accordingly, the Indictment must be dismissed as content-based.

### III. THE GOVERNMENT'S INDICTMENT ALSO VIOLATES RFRA AND THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT.

For similar reasons, given Mr. Houck's discriminatory treatment and the religious motivations for his conduct, the Government's indictment must be dismissed for violating the federal Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment.

#### A. RFRA

RFRA applies to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993," "unless," as to any law passed after that date, the "law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-39(a), (b). FACE was adopted in May 1994 but makes no reference to RFRA, *see* 18 U.S.C. § 248, and thus is subject to its rigorous requirements.

Under RFRA, the Government may not enforce even a facially neutral federal law in a manner that substantially burdens a person's religious exercise, unless the Government

demonstrates that the burden is "the least restrictive means" of furthering a "compelling government interest" as applied to the religious individual. 42 U.S.C. § 2000bb-1(b)(1), (2). In other words, substantial burdens on religious exercise must pass strict scrutiny—"the most demanding test known to constitutional law," which "will often be difficult" for the Government to satisfy. *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997).

It is undisputed that Mr. Houck is co-founder and president of "The King's Men," a religious organization dedicated to helping men overcome pornography addictions and grow in spiritual strength.[16] *See* Farnham, 3/21/22, USAO0000119; *see also* Love, 1/5/22, USAO0000081. Mr. Houck's pro-life praying and sidewalk counseling is similarly religiously motivated. Accordingly, when Mr. Love "intercept[ed]" Mr. Houck as he walked toward the pregnancy center with two women, Mr. Love was plainly interfering with Mr. Houck's religious exercise. Farnham, 3/21/22, USAO0000117-119. Mr. Houck's resulting contact with Mr. Love to continue his counseling was thus *in furtherance of* this religious exercise.

Additionally, Mr. Love is known to have "cussed out" pro-life individuals in that vicinity before. Thus, when he approached Mr. Houck and his 12-year-old son on the corner of 12th and Locust Street that same day, Mr. Houck said "get away from my son" several times, and he attempted to block Mr. Love's attempts to gain access to his son. Id., USAO0000118. When Mr. Love was ultimately shoved after making another attempt to get in Mr. Houck's face, Mr. Houck was again acting in furtherance of his religious beliefs, to protect his son from Mr. Love's vulgarities and harassment.

---

[16] https://thekingsmen.org/about-us/mark-houck/.

As a result of this religious exercise, Mr. Houck now faces a maximum of 11 years in prison, three years of supervised release, and fines up to $350,000[17]—easily a "substantial burden" under RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014).

Therefore, the Government's prosecution of Mr. Houck must satisfy strict scrutiny. But government action "cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). And here, as noted, the Government has entirely refused to prosecute Mr. Love for his actual and direct obstruction of Mr. Houck's attempt, on the same day, to escort women to the pregnancy center across the street. The Government has also refused to prosecute the more than 150 nationwide incidents of damage and destruction inflicted on pregnancy centers and churches expressly protected by FACE. Thus, even assuming *arguendo* that Mr. Houck violated FACE, the Government can "offer[] no compelling reason why it has a particular interest in denying an exception to [him] while making them available to others." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021).

Even if the Government had a compelling interest, the "least restrictive-means standard is exceptionally demanding," requiring it to show it lacks any "other means of achieving its desired goal." *Hobby Lobby*, 573 U.S. at 728. Here there is no evidence that Mr. Houck actually interfered with abortion access at all, the very purpose of FACE. In both Counts, Mr. Love directly targeted Mr. Houck, not vice versa, both (1) as Mr. Houck was across 12th Street 100 feet away from the Planned Parenthood entrance and (2) as Mr. Houck was standing at the corner of 12th and Locust Streets 50 feet away from the Planned Parenthood entrance. Moreover, the local prosecution

---

[17] https://www.justice.gov/opa/pr/pennsylvania-man-indicted-assaulting-reproductive-health-care-provider.

process is a manifestly less restrictive means.[18] FACE itself states that it does *not* provide

"exclusive criminal penalties" nor "preempt State or local laws that may" penalize the conduct

covered by FACE. 18 U.S.C. § 248(d)(3). Given Mr. Houck's religious motivations and his lack

of actual interference with abortion access, the FACE-acknowledged local-prosecution process is

plainly a less restrictive means of achieving the same interest. Thus, the Government's Indictment

fails strict scrutiny and violates RFRA.

### B. Free Exercise Clause

While neutral laws of general applicability that burden religious exercise are presumptively

valid, government action "lacks general applicability if it prohibits religious conduct while

permitting secular conduct that undermines the government's asserted interests in a similar way."

*Fulton*, 141 S. Ct. at 1878. Such laws must also undergo strict scrutiny.

Importantly, "de facto exemptions can demonstrate that a challenged [government action]

is not generally applicable." *Soos v. Cuomo*, 470 F. Supp. 3d 268, 280 (N.D.N.Y. 2020). That is

exactly the case here, given the Government's radically lopsided enforcement of FACE against

Mr. Houck's religiously motivated conduct—which did not obstruct abortion access in any way—

while thus far turning a blind eye to Mr. Love's interference with Mr. Houck's activities and to

the nationwide violence against pregnancy resource centers, often with the result of delaying or

entirely shutting down their services.[19]

Therefore, the Government's blatant over- and underinclusivity—enforcing FACE against

a pro-life individual who did not in any way obstruct abortion access, while refusing to enforce it

---

[18] And such local prosecution actually occurred here, as noted *supra*.

[19] *See, e.g.*, Nicole Ault, "The Attacks on Crisis-Pregnancy Centers," Wall Street Journal, June 20, 2022, https://www.wsj.com/articles/the-attacks-on-crisis-pregnancy-centers-janes-revenge-abortion-roe-v-wade-violence-destroyed-11655653644.

against pro-choice individuals who have stymied or effectively destroyed pro-life pregnancy centers, easily triggers strict scrutiny, which the Government fails for the reasons already discussed.

Accordingly, the Government's indictment must also be dismissed for violating RFRA and the Free Exercise Clause.

## IV. THE GOVERNMENT CANNOT ESTABLISH THE FACE ACT'S SPECIFIC INTENT REQUIREMENT.

FACE is a specific-intent statute requiring "that a defendant act *because* the interfered-with person was seeking, obtaining, or providing . . . reproductive health services," and thus an "intent to injure . . . alone will not suffice to make out a claim under § 248(a)(1) without a showing that the intent . . . existed because of the motivation specified by the statute." *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004) (emphasis in original); 42 U.S.C. § 248(a)(1).

Here, no reasonable jury could find that Mr. Houck acted with the requisite specific intent in light of the indisputable evidence. As noted, during the incidents alleged in both Counts (the second of which is depicted on video), it was Mr. Love who confronted Mr. Houck, *not vice versa*, approximately 100 feet and 50 feet away from the Planned Parenthood entrance, respectively. And Mr. Love refused to stop obstructing Mr. Houck or communicating with him and his son even after Mr. Houck told and directed him to stop and go away. While the Government omits these key facts from its Indictment, they are indisputable, and they prevent the Government from establishing that Mr. Houck's actions were "because [Mr. Love] has been, or in order to intimidate [Mr. Love] from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1).[20]

---

[20] There is also no evidence that Mr. Houck specifically intended to "injure, intimidate, or interfere" with Mr. Love in either of these incidents, which "is a separate intent requirement that must . . . be proved" in order to establish a FACE violation. *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004).

Another Court in this District has already determined that materially similar facts do not

establish liability under FACE. In *Allentown Women's Center, Inc. v. Sulpizio*, the Court denied a

preliminary injunction motion for an alleged violation of FACE's use-of-"force" clause where a

pro-life individual physically pushed an abortion facility escort near the facility's driveway. 403

F. Supp. 3d 461, 467-68 (E.D. Pa. 2019). The Court determined, based on video evidence, that the

pro-life individual (Sulpizio) "did not come up to an escort volunteering at the Center prior to

making contact, . . . but, instead, Escort Stiles walked down the driveway . . . and confronted

Sulpizio at the car" as Sulpizio was attempting to converse with one of its occupants. *Id.* at 468

(internal quotations omitted). While this "created a mutually volatile situation in which one of

them . . . could have gotten hurt," the video showed that both "were equally responsible for being

in each other's face, neither backing off, and the contact was a consequence of this mutually close

and brief encounter." *Id.* The Court noted that Sulpizio was clearly on the public right of way, and

that "the video shows that Sulpizio did not use force *because* Escort Stiles was providing

reproductive health services, but instead used force in connection with a mutual argument over

Sulpizio's position and the time he was spending exercising what he believed to be his

Constitutional rights." *Id.* (emphasis in original).

The same is all the more true here. Mr. Love walked down the sidewalk to where Mr.

Houck was standing and continuing to communicate with Mr. Houck and his son even after Mr.

Houck directed him to go away. At worst, this was a mutually fraught situation, especially once

Mr. Love aggressively turned directly back toward Mr. Houck, after Mr. Houck had directed him

back toward Planned Parenthood. This is likewise true for the allegations of Count One, in which

Mr. Love confronted Mr. Houck as Mr. Houck was conversing with two women outside the

pregnancy resource center down and *across the street*. Again, the contact here—approximately

100 feet away from the abortion facility entrance—"was a consequence of this . . . close and brief encounter" instigated by Mr. Love, not Mr Houck. *Sulpizio*, 40 F. Supp. 3d at 468.

In light of these indisputable facts, the Government cannot establish that Mr. Houck acted "because of" Mr. Love's provision of reproductive health services as required by FACE. Both Counts must accordingly be dismissed.

## V.  APPLICATION OF FACE TO MR. HOUCK EXCEEDS CONGRESS' POWERS UNDER THE COMMERCE CLAUSE, AND SINCE THE DECISION IN *DOBBS* NO FEDERAL CIVIL RIGHTS INTEREST CAN SUPPORT FACE'S CONSTITUTIONALITY.

### A.  The Commerce Clause Does Not Provide Jurisdiction For This Prosecution.

The Government's application of the FACE Act to Mr. Houck's alleged actions leaves the statute unrestrained by limits on federal jurisdiction. Enacted in 1994, the FACE Act reads in pertinent part as follows:

> Whoever—
>
> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services [shall be subject to the penalties and civil remedies set forth in the act].

18 U.S.C. § 248(a). Unlike many other federal criminal statutes, FACE contains no express jurisdictional element—a factor that is often used to prevent statutes, and their application, from exceeding the powers granted to the federal government under the Commerce Clause. *See, e.g., United States v. Singletary*, 268 F.3d 196, 205 (3d Cir. 2001) (jurisdictional nexus sufficient for constitutionality of criminal statute at issue (18 U.S.C. § 922(g)(1)); *but see United States v. Rodia*, 194 F.3d 465, 472-73 (3d Cir. 1999) (jurisdictional nexus for offense not necessarily sufficient to support constitutionality of a statute under the Commerce Clause).

20

Article I, section 8, clause 3 of the U.S. Constitution grants Congress the power to regulate interstate commerce. This has been interpreted to reach three subjects of regulation: "the use of the channels of interstate commerce;" "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and "activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce[.]" *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted).

"While this final category is broad, 'thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.'" *United States v. Morrison*, 529 U.S. 598, 613 (2000) (quoting *Lopez*, 514 U.S. at 559-60). The Third Circuit has explained further that, though it is not necessarily a *per se* rule, Congress generally may "not regulate non-economic conduct based solely on that conduct's aggregate effect on interstate commerce." *United States v. Kukafka*, 478 F.3d 531, 535 (3d Cir. 2007) (internal quotation and marks citations omitted). To determine whether purely intrastate activity can be regulated under this third category, often referred to as the "Affectation Doctrine," courts look to "(1) the economic nature of the regulated activity; (2) a jurisdictional element limiting the reach of the law to a discrete set of activities that additionally has an explicit connection with or effect on interstate commerce; (3) express congressional findings regarding the effects upon interstate commerce of the activity in question; and (4) the link between the regulated activity and interstate commerce." *Id.* at 535-36 (internal quotation marks and citations omitted). Applying these factors, the Third Circuit has previously upheld by the constitutionality of FACE under the Commerce Clause in *United States v. Gregg*, 226 F.3d 253 (3d Cir. 2000). *Gregg*, however, did not involve

an as applied challenge to FACE. Additionally, the intervening two decades have worked changes in Commerce Clause jurisprudence that undermine *Gregg*'s reasoning.

### 1. The Indictment Fails To Allege Actions Within *Gregg*'s Scope.

The Third Circuit's 2000 decision in *Gregg* sustained (over a dissent) the facial constitutionality of FACE, and even did so despite the statute's failure to include an express jurisdictional requirement as an element of a FACE violation. The forms of conduct actually at issue in *Gregg* involved groups of protestors[21] banding together to blockade an abortion clinic. *See id.* at 256 ("The district court found that the defendants violated FACE when they conducted the three blockades."). Even when the opinion in *Gregg* speaks more generally about the type of conduct made illegal under FACE, it discusses clinic patients and *clinic employees* as the categories of person protected. *See., e.g., id.* at 256, 259, 264-65. Nowhere does Gregg discuss volunteers like Mr. Love. Therefore, *Gregg* does not itself address the issue of whether volunteers are protected by FACE without a further showing of economic impact.

### 2. Post-*Gregg* Decisions Of The Supreme Court Make Clear That Congress Does Not Possess Unfettered Power To Regulate Simply By Invoking A "Market" For Services.

While *Gregg* relies extensively on the interstate (or "national") market for abortion services to sustain the facial constitutionality of FACE, *see id.* at 263-67, it cannot be read in light of more recent case law to countenance broad criminalization of any activity (here, isolated and noneconomic intrastate activity) that involves a volunteer abortion clinic escort as the alleged victim. This subsequent precedent demands more specificity than simply some conceivable

---

[21] The Indictment refers to Mr. Houck as a "protestor," but this description is wholly inaccurate. He is a sidewalk counselor, who provides counseling to women on alternatives to abortion and assistance to the nearby pregnancy resource center. *See McCullen v. Coakley*, 573 U.S. 464, 489 (2014) ("Petitioners are not protestors. They seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them.").

connection between the alleged conduct and an interstate market as such, and the federal government's mere assertion that there is a "market" for certain services does not allow it to regulate that which would otherwise fall outside of the jurisdiction of the federal government. Additionally, absent clear Congressional intent, federal statutes are not generally to be interpreted as reaching local crimes that are traditionally matters of state concern.

### a. The Commerce Clause Requires Specificity In The Activity To Be Regulated Sufficient To Reasonably Cabin A Statute's Reach.

"[T]he Commerce Clause does not authorize Congress to 'regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.'" *United States v. Whited*, 311 F.3d 259, 266 (3d Cir. 2022) (quoting *Morrison*, 529 U.S. at 617). The Third Circuit, too, has "agree[d] that the concerns expressed in *Lopez* preclude applying the 'aggregation test' so broadly that it sweeps within its reach every use of every property that has an effect on interstate commerce no matter how diluted." *United States v. McGuire*, 178 F.3d 203, 211 (3d Cir. 1999); *see id.* ("The government is correct in conceding that 'some uses are so trivial or attenuated that they are not covered by [the statute].'").

While the Government is not constitutionally required to show that a *particular* instance of an offense has a substantial effect on interstate commerce, the "class of acts" proscribed by a statute pursuant to the Commerce Clause must be susceptible to description with sufficient specificity that the category does not itself include noneconomic local crime that itself has no connection to interstate commerce. For example, in *Gonzales v. Raich*, 545 U.S. 1 (2005), the Supreme Court explained that "purely local activities that are part of an *economic* 'class of activities' that have a substantial effect on interstate commerce" fall within the reach of Congress' Commerce Clause powers. *Id.* at 17 (citations omitted) (emphasis added). Because the growing of a product, even for local use only, is "quintessentially economic" activity, Congress could validly

regulate the intrastate cultivation, possession, and use of marijuana. *Id.* at 25-26; *see also id.* at 32-33; *Jones v. United States*, 529 U.S. 848, 859 (2000) ("We hold that the [a statute criminalizing arson of property 'used in . . . any activity affecting . . . commerce'] . . . covers only property currently used in commerce or in an activity affecting commerce. The home owned and occupied . . . was not so used—it was a dwelling place used for everyday family living.").

Likewise, Congress is not permitted to criminalize *all* assaults in the proximity of an abortion clinic simply because *some* such assaults may affect have an economic character that might be aggregated to find an effect on interstate commerce. Nevertheless, this prosecution seeks to sweep into federal jurisdiction allegations of purely local noneconomic assaultive conduct. Any definition that included the purely local noneconomic assaultive conduct charged in this case would be insufficiently specific to pass scrutiny under Commerce Clause jurisprudence.

### b. An Interstate Market Alone Is Insufficient For Plenary Regulation Of Intrastate Conduct.

Following the Third Circuit's decision in *Gregg*, the U.S. Supreme Court made plain the insufficiency of an interstate "market" alone to support plenary federal regulation under the Commerce Clause of *any form* of intrastate conduct. Thus, in *NFIB v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court held that an individual's decision to not purchase health insurance was beyond the regulation of Congress under the Commerce Clause. The Court reasoned that an individual's decision against purchasing health insurance is not economic activity, and moreover it could not be swept into the jurisdictional power of the federal government simply because there is, indisputably, a national market for healthcare. *See* 567 U.S. at 551-57.

### c. Federal Criminal Statutes Must Be Interpreted To Avoid Intrusion On The State's Traditional Control Over Local Criminal Conduct.

Furthermore, when confronted with "an improbably broad reach" of a federal criminal statute, it is appropriate to seek recourse to principles of federalism, including a presumption against "interpreting the statute's expansive language in a way that intrudes on the police power of the States" to reach "purely local crimes," to properly interpret the law. *Bond v. United States*, 572 U.S. 844, 859-60 (2014) (internal citations omitted). While the federal government possesses only those powers expressly enumerated in the Constitution, "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," U.S. Const. amend. X. "As James Madison wrote, 'the powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" *Lopez*, 514 U.S. at 552 (quoting The Federalist No. 45, pp. 292-93 (C. Rossiter ed. 1961)). This division between the powers of the federal and State governments is not a trifling technicality, but rather "was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985) (quoting *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 572 (1985) (Powell, J., dissenting)); *see Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (describing "dual sovereignty").

One of the powers the federal government lacks that the states retain is a general police power. "For nearly two centuries it has been 'clear' that, lacking a police power, 'Congress cannot punish felonies generally' . . . A criminal act committed wholly within a State 'cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'" *Bond*, 572 U.S. at 854 (internal citations omitted). Thus, it must be clear that Congress intended to reach crime of a local nature before a federal statute will be construed to criminalize such conduct. *Id.* at 860.

### 3. The Indictment's Allegations Amount, At Most, To Minor Street Scuffles With No Economic Effect And Lacking A Basis For Federal, As Opposed To State, Jurisdiction.

The Indictment here alleges no economic impact from the alleged offenses, which are—by the Indictment's own terms—only scuffles on a city street. The Government's application of federal criminal jurisdiction to Mr. Houck's alleged conduct pushes the elasticity of the power of the Commerce Clause to its breaking point and deprives the States of powers retained under the Tenth Amendment.

The Indictment admits that Mr. Love was a "volunteer escort" for the Planned Parenthood Clinic, not an employee. There is no allegation that Mr. Love and Mr. Houck are citizens or residents of different states (which they are not), nor is there any allegation of interstate travel by either Mr. Love or Mr. Houck. The Indictment does not allege that Mr. Houck's conduct is part of any pattern or practice or that he is part of any organizational network that engages in FACE violations.

The Government fares no better when looking to details of each of the two specific instances. In Count One, the Government alleges that Mr. Houck "shoved" Mr. Love "as Mr. Love *attempted* to escort two [Planned Parenthood] patients." (Indictment at Count One ¶ 5 (emphasis added).) Thus, the Government does not allege that Mr. Love was actively engaged in escorting the patients at the time or moreover that this alleged shoving had any effect on commerce, interstate or otherwise, by affecting one's decisions about reproductive services.[22]

---

[22] The Government's omission in this regard is telling. The two women had already left and were well away from the Planned Parenthood abortion facility. They were speaking with Mr. Houck about alternatives to abortion while heading toward a pregnancy resource center when Mr. Love attempted to interfere, using physical force to do so. Despite this interference by Mr. Love with Mr. Houck's consensual conversation, the Government has decided to allege that Mr. Love was the victim in the encounter.

Count Two of the Indictment is even more deficient. It does not even allege that Mr. Love was engaged in an "attempt" to escort Planned Parenthood patients. The only allegation the Government can bear to muster is that this "shoving" of Mr. Love occurred "in front of the [Planned Parenthood clinic]." (*Id.* at Count Two ¶ 2.)[23]

Thus, there is no class of *economic* activity into which Mr. Houck's conduct legitimately falls. By failing to connect the alleged offenses in a meaningful to way particular economic actions over which there is federal jurisdiction, the Government impermissibly tries to regulate types of persons (namely, those advocating against abortion) instead of conduct. The Supreme Court has made clear, however, that Congress has the "power to regulate 'class[es] of activities,' . . . not classes of individuals, apart from any activity in which they are engaged[.]." *Sebelius*, 567 U.S. at 556 (internal quotation marks and citations omitted).

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" regarding criminal law since "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971). Ultimately, the two incidents at issue in this case are, at most, irritation-born scuffles on a city street between two men. There was no commerce involved, interstate or otherwise, and both men are residents of the state in which the events occurred. Regulation of such matters, both civilly and criminally, has been a matter for the states since the founding of the United States. *See, e.g., Lopez*, 514, U.S. at 561 n.3 ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law.") (citation omitted)). In contrast to the federal government, the Commonwealth of Pennsylvania (like other

---

[23] The Government also alleges Mr. Houck "verbally confronted" Mr. Love in support of Count Two but does not allege any connection to abortion, nor disclose that the verbal confrontation related to Mr. Love's attempts to go near and speak with Mr. Houck's son.

states) has a well-developed body of law governing what constitutes a criminal assault[24] between individuals scuffling on a city street. *See, e.g.,* 18 Pa.C.S. § 2701 (simple assault); *id.* § 2702 (aggravated assault); *see, e.g., Commonwealth v. Decker*, 445 Pa. Super. 101, 108, 664 A.2d 1028 (1995) (elements of simple assault). Importantly, *state law also includes defenses* that are not necessarily available under FACE—or at least are not expressly provided in the text of FACE. *See, e.g., Commonwealth v. Mouzon*, 617 Pa. 527, 532-33, 53 A.3d 738 (2012) (discuss self-defense and discussing change in law as to burden of proof between prosecution and defendant); *see also* 18 Pa.C.S. § 2701(b) (simple assault declared second degree misdemeanor unless committed "in a fight or scuffle entered into by mutual consent, in which case it is a misdemeanor of the third degree").

Application of FACE to the facts at issue here would displace these important policy decisions made by the Commonwealth of Pennsylvania in the exercise of its traditional sovereign power to proscribe and punish crime occurring on its streets. *See Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 841-42 (4th Cir. 1999) (describing most crimes as matters of traditional state concern) ("Congress not only has encroached upon the States' ability to determine when and how violent crime will be punished . . . but in so doing has blurred the boundary between federal and state responsibility for the deterrence and punishment of such crime."). Dismissal is particularly warranted in this case because local courts have already adjudicated the matter. Well prior to the issuance of the Indictment by the Grand Jury, Mr. Love had taken out misdemeanor charges in Philadelphia County. When the case was called for trial, Mr. Love failed to appear, and the prosecution requested a continuance. Because of prior instances of Love failing to appear, the

---

[24] Mr. Love did not even assert the contact alleged in Count One in his private criminal complaint, apparently believing it so minor as to not rise to the level of criminal conduct.

trial judge dismissed the charges. Despite this action by the Pennsylvania courts, the federal government now seeks a second bite at that apple.

Without a basis for the Court's exercise of federal jurisdiction, the indictment in this case should be dismissed.

### B. There Is No Federal Law Interest In Abortion To Be Protected By FACE, Post-*Dobbs*.

With the issuance of the ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022), federal Supreme Court precedent conferring a right to abortion was overruled. Accordingly, "the authority to regulate abortion [was] returned to the people and their elected representatives" because "the Constitution does not confer a right to abortion." *Id.* at 2279, 213 L. Ed. 2d 545. If there is to be a basis for sustaining Congress' ability to enact FACE, then, it can only be found in the Commerce Clause and not in the authority to protect a non-existent federal right to abortion.

### CONCLUSION

WHEREFORE, for the reasons stated above, the defendant requests that the indictment be dismissed.

Respectfully submitted,

s/BRIAN J. MCMONAGLE
BRIAN J. MCMONAGLE, ESQUIRE

29

## CERTIFICATE OF SERVICE

BRIAN J. MCMONAGLE, Esquire hereby certifies that a true and correct copy of the foregoing document has been electronically filed.

<u>**s/ BRIAN J. MCMONAGLE**</u>
**BRIAN J. MCMONAGLE, Esquire**

**DATED: 12-5-22**