**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | |
| **MARK HOUCK** | : | **NO. 2:22-cr-00323-GJP** |

## OBJECTIONS TO GOVERNMENT'S JURY INSTRUCTIONS

Defendant Mark Houck, by his undersigned counsel, hereby objects to the Government's Jury Instructions (dkt. #47), and states in further support as follows:

Defendant submits the objections herein solely to address select new issues and those issues on which Defendant believes written objections would assist the Court. Where the government and the Defense have provided competing instructions, the Defense respectfully contends its versions are superior in that they are clearer and more concise, less argumentative, and more correctly state the applicable law.

**General Objection**

Defendant objects to any use of initials, pseudonyms, or the like in any communications from the Court to the jury. This is a public trial, alleging two altercations between adults on a public sidewalk. There is no need for the use of alias identifiers, and using identifiers would prejudice Defendant by indicating to the jury that Mr. Love requires some level of protection, whether due to the actions of Mr. Houck or some unsubstantiated concern about his personal security. The Government through its proposed voir dire and questionnaire has tried to bring before the jury prejudicial evidence of alleged unrelated incidents at abortion facilities around the country: the use of identifiers in its instructions, instead of proper names, is a further extension of these efforts to tar Defendant with other unrelated incidents.

1

Defendant also objects to the Government's use of italics and underlines in its proposed instructions as unnecessary and argumentative.

**Specific Objections to Government's Instruction 11 - "And" means "Or"**

This instruction prejudicially repeats the government's allegations, improperly and unnecessarily emphasizes those allegations, and argues the government's theories of the case. The Government made its choice of language in the indictment, and that language needs no clarification.

Moreover, the Government appears to indicate it intends to argue to the jury all sixty (6 x 2 x 5 = 60) different possible theories of liability, for each count. This Court need not and should not assist the Government in its trial tactic. If jurors are confused by the Government's request that they individually review and evaluate 60 different theories of liability for each count, that confusion is entirely the fault of the Government and a difficulty it imposed upon itself in deciding the language of the indictment.

If the Court intends to allow this instruction, the language of the indictment and any highlights, italics, and underlines should be stricken—the repetition and emphasis are unnecessary and prejudicial; they improperly press the Government's case theories, and give credence to the Government's decision to adopt a confusing trial tactic.

**Specific Objections to Government's Instruction 12 - Elements of the Offenses Charged**

The Defense instruction on this point is superior and should be adopted. The Government's instruction conflates the factual element—whether Mr. Love provides reproductive health services in a facility—with the motive element—whether Houck used force because Love provides the specified reproductive health services in a facility.

By conflating these two elements, the Government's instruction assumes as true a highly disputed fact that is the Government's burden to prove, that Mr. Love is providing reproductive health services in a facility, and invites the jury to "think past the sale" and skip ahead to motive, without deciding whether Mr. Love is even providing the required services. Combining the threshold factual question with the motive question will also confuse the jury about its duty in regard to the elements of the offense and improperly prejudice the jury in favor of the Government's view of the case.

**Specific Objections to Government's Instruction 16 - Third Element of Counts One and Two – Defendant Acted Because the Victim Was, or Had Been, Providing Reproductive Health Services, or to Keep the Victim from Providing Such Services**

The Government's proposed instruction 16 repeats and compounds the errors and prejudice, discussed *supra*, of the Government's Instruction 12.

In particular, the third paragraph of the Government's Instruction 16 is non-textual and wrong. Abortion escorts are not "providers" of "reproductive health services" under the FACE Act, nor does the term "provider" even appear in the Act. The FACE Act requires that a person be *providing* identifiable reproductive health services *in a facility*. 18 U.S.C. 248(a)(1) & (e)(5); *see Connecticut Nat. Bank v. Germain*, 503 U. S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.") (citations and internal quotation marks omitted).

The text of the FACE Act is clear: the Act excludes services provided *outside* a facility, especially whatever "services" are provided on the public sidewalk by abortion escorts. Even if the Act were not clear on this point, any ambiguity must be resolved in favor of the defendant, not the government, under the rule of lenity. *See United States v. Nasir*, 17 F.4th 459, 472–73 (3d

Cir. 2021) (en banc) (Bibas, J., concurring) ("Under the rule of lenity, courts must construe penal laws strictly and resolve ambiguities in favor of the defendant. The touchstone is the text: the 'ordinary,' evidently intended meaning of 'the words of the statute.' The rule of lenity serves three core values of the Republic. First, it is entwined with notice and thus due process. It gives citizens fair warning of what conduct is illegal, ensuring that ambiguous statutes do not reach beyond their clear scope. Second is the separation of powers. As Chief Justice Marshall explained, the rule of lenity stems from 'the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.' If Congress wants to criminalize certain conduct or set certain penalties, it must do so clearly. And third but perhaps most importantly, the rule of lenity serves our nation's strong preference for liberty. As Judge Henry Friendly explained, lenity expresses our 'instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' That approach fits with one of the core purposes of our Constitution, to 'secure the Blessings of Liberty' for all citizens. Penal laws pose the most severe threats to life and liberty, as the Government seeks to brand people as criminals and lock them away. To guard against those threats, the rule of lenity favors respect for individual rights.") (cleaned up).

But even more, the legislative history of the FACE Act shows that Congress intended to *exclude* the activities of abortion "escorts" (sometimes called "defenders") from the meaning of reproductive health services provided "*in a facility*" under the FACE Act.

1. **Congress Expressly Excluded Abortion Escorts' Activities From the Meaning of "Reproductive Health Services" Under the FACE Act.**

Congress was clear that so-called clinic "escorts" and "defenders" are separate and distinct from those who provide reproductive health services, and that any conduct of a defendant motivated *by an escort's* actions are not covered by the FACE Act. This is clear from

the fact that Congress added a now-codified provision to the Act limiting private civil suits only to those who actually provide reproductive health services "in a facility." As shown below, Congress chose that language for the *express purpose of excluding escorts*. But this also necessarily confirms that even for criminal law purposes, escorts cannot be deemed providers of reproductive health services *in a facility*—in direct conflict with the Government's proposed Instruction.

The original abortion clinic access bills introduced in the U.S. Senate and House in 1993 included broad allowances in their civil remedies provisions for any person "aggrieved" to bring a suit under the FACE Act. The Senate Committee Report describing this original civil remedy separated those "aggrieved persons" who were "for example, patients, physicians or clinic staff," on the one hand, versus those "[p]ersons injured in the course of assisting patients or staff in gaining access to a facility, or injured bystanders," on the other. The Committee noted that this latter group "may also sue if they can establish that the conduct causing the injury was undertaken with the requisite motive—in order to intimidate some person or class of persons from obtaining or *providing abortion-related services."* S. Rep. 103-117, at 26 (emphasis added).[1] The Committee thus grouped "persons . . . assisting patients or staff in gaining access to a facility" with "injured bystanders," and separated them from those "patients, physicians or clinic staff" who are actually obtaining or providing reproductive health services in a facility.

That original broad language with respect to who could sue was then narrowed, by an agreed amendment between chief sponsor Sen. Ted Kennedy (D-MA) and Sen. David Durenberger (R-MN), to limit civil actions only to "aggrieved" persons who are actually "involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a

---

[1] Pages cited from the legislative history of the FACE Act are attached hereto.

facility that provides reproductive health services." 18 U.S.C. §248(c)(1)(A), *compare*

§248(e)(5) ("'reproductive health services' means reproductive health services provided in a

hospital, clinic, physician's office, or other facility"). In other words, not all "aggrieved persons"

could sue, but only those actually involved in the provision of reproductive health services, *i.e.*,

those actually "obtaining or providing" reproductive health services *in a facility*. 18 U.S.C.

§248(a)(1) & (e)(5). Congress thus understood that abortion "clinic escorts" and "clinic

defenders"[2] are not "providing" or "obtaining" services "in a facility." By limiting remedies to

those actually "providing" or "obtaining" in a facility, Congress understood it was excluding

abortion escorts and their activities from the meaning of "reproductive health services" (as

specially defined to mean "reproductive health services *in a . . . facility*," § 248(e)(5)) under the

Act.

Sen. Kennedy described the amendment in his remarks opening the primary debate on the

bill which would become the FACE Act:

> As reported by the Labor Committee, S. 636 permitted any person aggrieved by
> the prohibited conduct to sue for damages or injunctive relief. That could have
> been read to permit suits against clinic attackers to be brought not only by a
> patient or doctor or clinic owner, but also by a pro-choice demonstrator or clinic
> defender. Pro-life demonstrators outside the same clinic would not have had a
> similar right to such relief. As modified, the bill restores the evenhandedness
> principle. It permits suits only by persons involved in providing or obtaining
> services in the facility. If demonstrators outside a clinic engage in pushing,
> shoving, or other forceful conduct against each other, neither side can sue under
> this law.

139 Cong. Rec. S15659.

---

[2] It appears that the Senate at the time understood terms "clinic escorts" and "clinic defenders" to
be either interchangeable or overlapping—the common parlance today is to call these individuals
"escorts." *See, e.g.,* 139 Cong. Rec. S15722 ("Clinic Defense, A Model").

During floor debate, the fact that abortion escorts are not "obtaining or providing services in the facility" under the FACE Act, was reaffirmed in this colloquy between Sen. Kennedy and Sen. Durenberger:

> Mr. DURENBERGER. I also have two questions about the new language contained in section 2715(c) of the bill. I understand that that language limits those that may bring lawsuits under this bill to persons involved in obtaining or providing or seeking to obtain or provide pregnancy or abortion-related services.
>
> Mr. KENNEDY. That is right. Before this modification was made, there was no limitation on who might have a private cause of action under S. 636. In fact, that language was broad enough to cover protesters. ***Now, only those involved in obtaining or providing services have a private right of action*** under subsection (a)(1).
>
> Mr. DURENBERGER. By defining "aggrieved person" in this way, was it your intention to ***exclude clinic escorts or so-called clinic defenders***?
>
> Mr. KENNEDY. ***That is correct. Demonstrators, clinic defenders, escorts, and other persons not involved in obtaining or providing services in the facility*** may not bring such a cause of action.

139 Cong. Rec. S15682 (emphasis added).

Sen. Durenberger further explained the importance of the amendment:

> ***At that time the bill, as drafted, would allow*** pro-choice protesters, ***those protecting the right of entrants***, or the demonstrating, if you will, against the other demonstrators, ***a private right of action*** under private law. What the bill now does, because of the modifications that were worked out after the bill left the committee, is to take away that private right or course of action under Federal law. Now there is no need to extend that same right to pro-life protesters or demonstrators. ***The bill, as currently drafted before us, allows legal relief only to clinic patients and personnel.*** And this is the critical, if you will—not the only, but the critical—change that has been agreed to by the proponents of this legislation and by the Senator from Massachusetts. ***We have recognized that Federal law should be extended narrowly to protect only those who were actually attempting to obtain or provide medical or counseling services. It does not protect the escorts***. It does not protect the antidemonstrators, if you will.

139 Cong. Rec. S15686 (emphasis added).

The resulting statutory text reflects this intent.[3] As a matter of the plain text, not all persons aggrieved by violations of 18 U.S.C. § 248(a)(1) are those who provide or have provided reproductive health services, since the Act goes on to state that a "person aggrieved" can bring a civil suit under the FACE Act "only," as relevant here, if they are "a person involved in providing or seeking to provide . . . services in a facility that provides reproductive health services." 18 U.S.C. § 248(c)(1)(A). That means escorts cannot be deemed providers of "reproductive health services" "in a . . . facility" under § 248(a)(1), as defined by (e)(5). Under the plain text of the FACE Act, and in light of the legislative history confirming that the phrase providing reproductive health services "in a facility" *excludes escorts*, it is not legally possible to convict a defendant under the Act for conduct against an escort—such a defendant's conduct is not "because that person is or has been . . . providing reproductive health services." § 248(a)(1) (emphasis added).

But the Government's proposed Jury Instructions fallaciously state that it must show only that "the defendant acted as he did because B.L. was, or had been, providing reproductive health services, or the defendant acted as he did to keep B.L. from providing such services in the future." (*See, e.g.*, Govt's Proposed Instructions 12, 15, 16.) Again, this is impossible, for an abortion escort like Love does not qualify as providing reproductive health services in a facility.

### 2.   Court of Appeals Decisions Exclude Sidewalk Activities from the FACE Act.

Counsel have located only two decisions at the Court of Appeals that consider the issue squarely: those decisions confirm that the FACE Act excludes services proved *outside* a facility.

---

[3] The original language of Sen. Kennedy's amendment limited civil suits to those who provide or obtain "services in a medical facility that provides pregnancy or abortion-related services," Congressional Record—Senate, S. 15657, November 16, 1993, which is materially identical to codified final language limiting civil suits to those who provide or obtain "services in a facility that provides reproductive health services." § 248(c)(1)(A).

In *Lotierzo v. Woman's World Medical Center, Inc.,* 278 F.3d 1180 (11th Cir. 2002), pregnancy counselors alleged FACE Act violations on the public sidewalks outside their pregnancy care center and the abortion facility across the street. The pregnancy counselors provided reproductive health services counseling inside their Pregnancy Care Center, but the alleged incidents involved their counseling on the public sidewalk.

The Court of Appeals first noted that, "the FACE Act defines 'reproductive health services' as covering 'reproductive health services provided *in* a hospital, clinic, physician's office, or other facility. . . .'" *Id.*, at 1182 (emphasis in original). The Court then affirmed dismissal of plaintiffs' complaint, because the alleged wrongdoing (1) "arose because Appellants were providing referral counseling *outside of*" the abortion facility, not because of the "reproductive health services counseling provided *in*" their pregnancy center, *id.*, at 1182-83 (emphasis added), and (2) was not "taken in order to intimidate a person from obtaining or providing reproductive health services *at the Pregnancy Care Center*. Instead, Appellants merely were concerned with their ability to provide reproductive health referral counseling *outside of* the Pregnancy Care Center and *on the sidewalks in front of* A Woman's World Medical Center. Because Appellants failed to allege that Appellees' actions prevented anyone from seeking or providing reproductive health services *at the Pregnancy Care Center*, we affirm." *Id.* (emphasis added).[4]

---

[4] The Court of Appeals allowed one claim, where the wrongdoer "visited the Lifeline of Martin County facility and threatened Appellant Euteneuer. In the Amended Complaint, Appellant Euteneuer alleged that he also provides reproductive health services at the Lifeline facility. Specifically, Appellants' Amended Complaint alleged that in January 1998, Appellee Harding visited the Lifeline facility, approached a volunteer, and threatened to kill Appellant Euteneuer. We find that the Lifeline claim withstands a motion to dismiss because it satisfies all of the elements of a FACE Act claim. Unlike Appellants' other claims, the Lifeline claim alleges that Ms. Harding visited the Lifeline facility to threaten Appellant Euteneuer because he provides

The plaintiffs in *Lotierzo* had a stronger claim to FACE Act protection than Mr. Love, the volunteer abortion escort here: the *Lotierzo* plaintiffs provided identifiable reproductive health services counseling *in a facility*, but even so, once they stepped outside the facility, that same counseling on the public sidewalk was not covered by the FACE Act.

The second case is factually closer to this one. In *Raney v. Aware Woman Ctr. for Choice, Inc.*, 224 F.3d 1266 (11th Cir. 2000), a sidewalk counselor sought an injunction under the FACE Act. The Court rejected his claim, holding that a "FACE Act action may be brought 'only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services *in a facility* that provides reproductive health services....'" *Id.*, at 1268 (quoting 18 U.S.C. § 248(c)(1)(A)) (emphasis in original). The Court explained that,

> By requiring that the person bringing a FACE action be seeking or providing reproductive health services in a facility, Congress recognized the difference between trained professionals who work in credentialed facilities and unregulated volunteer counselors who are not attached to recognized providers of reproductive healthcare. On each of the three occasions when Raney was arrested for violating the *Madsen* injunction, he was standing on a sidewalk outside of the Woman Center clinic. He therefore can claim neither that he was in a facility nor that he was offering the type of reproductive health services to which the FACE Act protects access.

*Id.*, at 1269.

The volunteer abortion escort here, Mr. Love, is in no better position than Raney: volunteer "escorting" activities are not activities of the type the FACE Act is intended to protect, and even if they were, escorting on the public sidewalk *outside* a facility is not protected under the FACE Act.

---

reproductive health services and in order to intimidate him from providing such services. The Lifeline allegation is the only claim in which Appellants alleged a direct connection between the unlawful conduct and the reproductive health services offered by the person seeking protection under the FACE Act." *Id.*

The Government's position thus runs afoul of the clear explicit language of the statute, the express intent of Congress, and persuasive reasoned authority from the Court of Appeals. In support of its proposed instruction, the Government cites three cases, one from the Court of Appeals, *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996), and two District Court cases, *United States v. Hill*, 893 F. Supp. 1034 (N.D. Fla. 1994) & *Greenhut v. Hand*, 996 F. Supp. 372 (D. N.J. 1998).

**3.   The Government's Citations are Inapposite.**

In *Dinwiddie*, the 8th Circuit addressed whether a Maintenance Supervisor at an abortion clinic is protected by the FACE Act, despite not directly providing abortions or counseling pregnant women. The Court held that "workers at an abortion clinic" qualify as providing reproductive health services under the FACE Act. *Dinwiddie*, at 926-27. *Dinwiddie* sheds no light on the applicability of the FACE Act here, in a case involving a volunteer abortion escort allegedly providing reproductive health services outside of a facility, on a public sidewalk.

In *Hill*, an abortion doctor was driven to a clinic by two volunteer security personnel. After the three drove past the clinic's fencing and onto the private parking lot on the property, Hill opened fire, killing the doctor and one of the security guards, and injuring the other.[5] In response to the argument that "Dr. Britton's two escorts[6] did not perform or assist in performing abortions," the Court in *Hill* applied the FACE Act to those security personnel, holding, "It appears that Congress was concerned not only with the safety of doctors and nurses, but also

---

[5] A more detailed version of the events of the Hill case can be found at
https://www.washingtonpost.com/wp-srv/national/longterm/abortviolence/stories/hill.htm.
[6] The court in *Hill* used the term "escort" to describe the volunteer security personnel for the doctor in that case. This is not how the term "escort" was used in Congress, nor how "escort" is regularly used in the abortion context, including in this case. Escort here means a volunteer operating on the public sidewalk outside an abortion facility. The *Hill* Court did not indicate an intent for its holding to apply to "escorts" as that term is commonly used today.

with the safety of others who are essential to the provision of clinic services. As evidenced by the concerns of doctors and clinic directors voiced in the hearings before Congress, escorts are considered an integral part of the functioning of clinics. . . . I find that the Act, in light of its purpose and legislative history, includes a doctor's escort in the definition of 'provider,' at least where the escort is performing his or her duties at the time of the alleged violation of the Act." *Id.*, at 1039.

In *Hill*, the District Court did not address the applicability of the FACE Act to volunteer abortion escorts on the public right of way, or even reference that part of the Act's legislative history. In fact, the District Court did not interpret or analyze the "in a facility" requirement of the Act, at all. However, even the District Court in *Hill* appeared to recognize that its ruling stretched the limits of the FACE Act and may be limited to circumstances where a security person is "performing his or her duties at the time of the alleged violation." *Id.*

In *Greenhut v. Hand*, the plaintiff ("Greenhut") was a volunteer counselor at a Birthright pregnancy center. The defendant called Greenhut at home after hours and left her threatening voice messages. The District Court first held, in response to the argument that Birthright did not provide medical services, that the FACE Act expressly covers counseling and referral, which Birthright personnel provide. *Id.*, at 375. The court next held that the mere fact of being a volunteer did not render Greenhut's counseling and referral services at Birthright outside the scope of the Act. *Id.*, at 375-76. As part of this latter holding, the court observed that, "FACE has been construed to prohibit threats or violence against abortion clinic escorts, *United States v. Hill*, and maintenance workers at abortion clinics, *United States v. Dinwiddie*, because they are integral parts of a business in which abortions are performed and pregnant women are counseled." *Id.*, at 376 (citations omitted). The *Greenhut* case did not involve a public sidewalk,

12

abortion escorts, or sidewalk counselors, nor did the District Court address the "in a facility" requirement of the Act, at all.

In its accompanying trial brief, (dkt. #45, at 5), the Government also flatly claims that "case law has established that volunteers and employees at a reproductive health care clinic are considered 'provide[rs of] reproductive health services,'" citing *Dinwiddie* and one additional Court of Appeals decision, *United States v. Scott*, 187 F.3d 282, 285 (2d Cir. 1999).

The Government's citation of the *Scott* appellate decision, but not the District Court decision, is curious. The Second Circuit in *Scott* did not analyze or opine on the subject of the applicability of the FACE Act to abortion escorts: the Court of Appeals merely noted in its recitation of Facts that the District Court had held as much, and that the defendant did not appeal that ruling.[7]

### 4.  Additional Specific Objections to the Proposed Instruction.

In the third and fourth paragraphs, calling Mr. Love a "provider" assumes a fact the jury must decide—whether Love provides identifiable reproductive health services in a facility—and inserts a term that is unhelpful and not taken from the FACE Act. Second, "volunteer escorts" are expressly excluded from the category of those who provide reproductive health services under the Act, as noted supra, because their relevant actions take place outside the facility, not in the facility.

---

[7] The District Court in *United States v. Scott*, 958 F. Supp. 761, 774 (D. Conn. 1997) mistakenly relied upon the Senate Committee Report statement discussed *supra*, apparently not realizing that the FACE Act was materially amended prior to passage. That Report statement described the allowance in the *original* bill for abortion escorts and injured bystanders to sue for FACE Act violations, which was then removed by Sen. Kennedy by agreed amendment. Moreover, the *Scott* District Court cited *Hill* for the proposition that a "physician's escort was a 'provider' covered by FACE." The first citation, to the Committee Report, proves the *opposite* of the *Scott* District Court's holding, and the second citation is inapposite (and confusing in its use of the term "escort"), as noted *supra*.

Moreover, in the second paragraph, the Government omits the FACE Act's definition of the term "facility," which exclusion may render the term confusing, and if any variant of the Government's Instruction is to survive, the definition of "facility" should be provided, to ensure a full definition of the term "reproductive health services."

And should any part of the Government's Instruction survive, at the end of that second paragraph, an instruction should be included to avoid jury confusion and to avoid the risk of non-FACE activity being relied upon by the jury, clarifying that, "Assisting patients or staff in gaining access to a facility is not providing reproductive health services in a facility." *See Lotierzo, supra*; *Raney, supra;* S. Rep. No. 103-117, at 26 (distinguishing between those "patients, physicians or clinic staff" and "persons injured in the course of assisting patients or staff in gaining access to a facility"); H. Rep. No. 103-306, at 14, 1993 WL 465093, at *711 ("These services *must* be rendered in a hospital, clinic, physician's office, or other facility.") (emphasis added).

Finally, the word "victim" is a pre-judgment of an issue squarely in the province of the jury to decide. It is the government's burden to prove that Mr. Love is a "victim" here, under the law at issue.  Accordingly, that word should not appear in the instructions from the Court.

**Specific Objection to Government's Instruction 17 – "Because"**

The Government's Proposed Instruction on FACE's critical "motive" element fundamentally misstates the law in at least two ways. First, although the Government admits FACE requires that it prove "but-for" causation, its proposed instruction erroneously blurs the line between "but-for" and "mixed motive" causation, which are different standards. The Government's Trial Brief even explicitly requests a "mixed motive jury instruction," under which it admits that Love's status a reproductive health provider must have only been a

"motivating factor" (ECF No. 45 at 5)—thus confirming that Instruction 17's confusing and erroneous language flows from the Government's misunderstanding of the law on that issue.

Second, the same Instruction also attempts to remove Houck's subjective motive from the analysis altogether, indicating that as long as the Government shows that Love was a provider of a reproductive services, and/or that Houck's conduct would not have occurred but for Love's claimed objective status as a provider—regardless of Houck's *subjective and determinative motivations*—then it has met its burden. That is absurd, and should be rejected.

1. **The Government's Instruction 17 conflates "but-for" and "mixed-motive" causation.**

As to but-for causation, the defendant is guilty only if the prohibited motive was *a determinative factor* for his conduct, even if he had mixed motives for his actions. As for motivating-factor/mixed-motive causation, the defendant is still guilty even if the prohibited motive was a *non-determinative* factor for his conduct (*i.e.*, the defendant is guilty *even if he would have acted the same way regardless of the prohibited motive*). Thus the Supreme Court has called the "mixed motive" test—*i.e.*, the one *expressly requested by the Government's Trial Brief*, and which plainly underlies its confusing (at best) proposed Instruction 17—"a lessened causation standard" compared to but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). The Government ultimately acknowledges it must establish but-for causation in this case. The higher "but-for" causation standard "filter[s] out conduct that Congress believe[d] need not be covered by a federal statute" and "ensur[es] that FACE does not federalize a slew of random crimes that might occur in the vicinity of an abortion clinic." *Dinwiddie*, 76 F.3d at 923.

Congress has provided a helpful example explaining the difference in a key amendment to Title VII of the Civil Rights Act of 1964. As is well known, Title VII prohibits employment

discrimination "because of" certain protected characteristics such as religion, sex, and race. 42 U.S.C. § 2000e-2(a). After the Supreme Court's interpretation of that standard in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (six justices agreeing the employer was *not liable* if it could show it would have *taken the same action anyway even if* sex, etc., was a motivating factor), Congress adopted the Civil Rights Act of 1991, which added a *separate and distinct* "mixed motive" standard to Title VII. Specifically, Congress added § 2000e-2(m), providing that it is an "unlawful employment practice" if a protected characteristic "was a motivating factor for any employment practice, even though other factors also motivated practice." *Nassar*, 570 U.S. at 348-49 (quoting § 2000e-2(m)). Critically, it also added § 2000e-5(g)(2), providing that if an individual shows the employer violated the new mixed-motive provision (§ 2000e-2(m)), and the employer shows it "would have taken the same action" anyway, *the employer is still liable, but only for* declaratory and injunctive relief, and for attorney fees and costs, *but not* for damages, reinstatement, admission of fault, hiring, promotion, or payment. *Id.* at 349 (quoting § 2000e-5(g)(2)(B)(i)-(ii)). So, in order to recover damages and be reinstated under Title VII, you must prove "but-for" causation. But some limited relief is still available if you can show at least "mixed motive/motivating factor" causation, *i.e.*, the "lesser causation standard." *See also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020) ("Under this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause." (Emphasis in original).)

FACE plainly requires proving heightened but-for causation. Although the Government acknowledges it must prove but-for causation, the instruction it has tendered erroneously allows the jury to find causation if Houck had only mixed motives, as confirmed by its Trial Brief's request for a "mixed motive jury instruction."

Specifically, after an opening recitation of FACE's "because of" language, the Government immediately attempts to qualify the standard by negation, via mixed-motive language, without explaining what but-for causation actually means. The Instruction immediately states: "However, you may find that the defendant is guilty even if there was more than one reason why he assaulted B.L. People often have many reasons for acting in a particular way." *But the exact same is true in mixed-motive causation*, where the prohibited motive is "one reason" among many for the individual's conduct, *even if the individual would have acted the same way for other reasons* (which would *defeat* a FACE charge). It is erroneous, confusing and unfairly prejudicial to define the "but-for" standard by immediately explaining qualifications that apply equally to mixed-motive causation. *Cf. Bostock*, 140 S. Ct. at 1739 (defining but-for causation by first carefully explaining its positive meaning—*e.g.*, "a but-for test directs us to change one thing at a time and see if the outcome changes," and "[i]f it does, we have found a but-for cause"—before its qualifications).

While it's true that conduct can have "multiple but-for causes," *id.*, or even other non-sufficient motivations, it is not true that a person's motive is a "but-for" cause *if he also had other reasons that sufficiently motivated his conduct*. The prohibited motive must actually tip the scales triggering the conduct, meaning that the other reasons were not sufficient. So it's not enough, and tends to confuse and conflate, to immediately say that Houck is guilty even if he had "more than one reason" for acting, as the Government's Instruction 17 indicates in its opening paragraph. If one possesses the prohibited motive, but *would have acted the same way anyway for other reasons*, the Government has shown only mixed-motive causation and thus failed its burden of proof under FACE. It's telling that in *Bostock*, Justice Gorsuch's example (on behalf of the majority) for "multiple but-for causes" was a hypothetical car accident that required mistakes

by the drivers of two different cars for the crash to occur, and not a scenario where one where

someone simply had "many reasons" for acting. *Id.*

While the Government's Instruction eventually acknowledges that the prohibited motive

must play a "determinative role in the defendant's decision,"[8] it again reverts to mixed motive

language by stating, in its fourth and final paragraph, that "[t]herefore, you may find that the

third element has been met, even if you find that the defendant also had *other reasons* for doing

what he did." (Emphasis added.) That general and unqualified language improperly indicates that

Houck is guilty *even if he would have engaged in the charged conduct anyway*, that is, for "other

reasons." *See United States v. Miller*, 767 F.3d 585, 591 (6th Cir. 2014) (Sutton, J.) (rejecting

district court's jury instruction that federal hate-crime statute could be violated by showing that a

person's religion was a "significant motivating factor for a defendant's action even if he or she

had other reasons for doing what he or she did as well," since "the phrase 'because of' requires

but-for causation—a showing that they would not have acted *but for* the victim's actual or

perceived religious beliefs") (cleaned up).

And indeed, the Government closes the final paragraph by stating that it need not show

that the prohibited motive was the "sole *motivation* for the defendant's actions" (emphasis

added), again blurring the line between but-for and mixed-motivation causation, in accord with

its Trial Brief's statement that it need only show that the prohibited motive "was a motivating

factor." (ECF No. 45 at 5.)

Accordingly, Defendant Houck offers an alternative instruction at the end of this

objection. And at minimum, he requests that this Instruction be substantially revised to follow the

---

[8] But the Government's "determinative role" explanation is also flawed for the reasons described in Point 2, *infra*.

clearer and more correct statement of the law in *Bostock*, and include a clarification that if the jury finds that Houck would have acted the same way anyway for other reasons, the Government has failed to prove but-for causation.

**2. The Government's Instruction 17 attempts to omit altogether its burden to prove Houck's *subjective motivation*.**

FACE's "but-for" causation requirement means the Government must show that Houck acted "because of the *motivation* specified by the statute"—*i.e.*, that his acts were dispositively and subjectively "*motivated by*" an improper purpose. *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004) (emphasis added) (internal quotes omitted). The Sixth Circuit, has rightly stated that the but-for causation standard applies "regardless of whether 'because of' refers to an easier-to-show prohibited act *or a harder-to-prove prohibited motive*." *Miller*, 767 F.3d at 591-92 (emphasis added). Applied here, FACE requires the Government to establish a "harder-to-prove prohibited motive," and not merely that any act by Love, or his alleged status, was an objective but-for cause of the events at issue.

But the Government's Instruction 17 violates that requirement. Specifically, in the first paragraph, the Government states that it "must only prove that *because B.L. was or had been providing reproductive health services*, it played a determinative role in the defendant's decision." (Emphasis added.) That sentence (which is, in the first instance, confusing at best) ostensibly focuses on the causative role of Love's objective conduct or status, separate from Houck's internal motivations. It also indicates the Government can establish causation simply by showing that Love allegedly was providing or had provided reproductive health services—*i.e.*, that such conduct would *inherently* play a "determinative role" in Houck's decision. But the Government must prove not only that Love was providing or had provided reproductive services, but also that such conduct by Love was "the straw that broke the camel's back" in Houck's

*subjective motivations* for acting. *Burrage v. United States*, 571 U.S. 204, 211 (2014); *see also Bostock*, 140 S. Ct. at 1739 (favorably citing *Burrage*).

This problem is exacerbated by the language of the final sentence of Instruction 17's opening paragraph. There the Government states that it can satisfy its burden simply by showing that "the assault[9] would not have taken place without *the incremental effect that B.L. was or had been providing reproductive health services*." (Emphasis and footnote added.) That sentence wholly removes any responsibility on the Government to show that Houck acted *because of an improper subjective motivation*, and instead simply allows it to establish guilt by showing that the event would not have occurred absent the objective "incremental effect" of Love's objective conduct (along the lines of Justice Gorsuch's car-accident example in *Bostock*, where another person's individual actions can technically be a contributing but-for cause of the ultimate event). FACE requires far more than that. As noted, it specifically requires the Government to establish "a harder-to-prove prohibited motive," *Miller*, 757 F.3d at 591; *Conole*, 386 F.3d at 484, and not simply that Love was providing or had provided reproductive services, or that his act of doing so played an objective but-for role in the events that unfolded. The Government's Instruction 17 tracks the latter, not the former, requirement, and is thus erroneous.

Accordingly, this aspect of the Government's proposed Instruction should be entirely rejected.

**3.  Alternative Proposed Instruction**.

---

[9] Houck objects to characterizing his conduct as an "assault"—which the Government's Instruction 17 does no less than four times—as unfairly prejudicial and factually untrue, since the state-court assault charge against him was dismissed with prejudice and the term unfairly attaches legal fault to Houck before any determination of guilt under FACE, which is the only standard of legal fault at issue in this case.  The Court should not allow any language in any instruction which indicates there has already been a finding by the Court regarding whether Houck engaged in some conduct or the legal consequence of any alleged conduct.

In light of the foregoing errors in the Government's proposed instructions, Houck hereby proposes the following jury instruction regarding FACE's but-for causation element for inclusion into Houck's as-filed proposed jury instructions, ECF No. 43, at Instruction 20, on "Element IV: Motive":

> In this context, the term "because" requires the Government to prove that the defendant would not have acted *but for* the fact that the person is or has been providing reproductive health services. If you find that the person's provision of reproductive health services was not a factor, or only one factor, in the defendant's conduct, and that the defendant's conduct would have occurred regardless of whether the person was providing or had provided reproductive health services, then the Government has not proven beyond a reasonable doubt that the defendant acted "because" the person is or has been providing reproductive health services.

Respectfully submitted,

s/ Brian J. McMonagle
BRIAN J. McMONAGLE, ESQUIRE
MCMONAGLE, PERRI, McHUGH,
MISCHAK & DAVIS, P.C.
Identification No. 42394
1845 Walnut Street, 19th Floor
Philadelphia, PA 19103
215-981-0999; Fax 215-981-0977
bmcmonagle@mpmpc.com
*Attorney for Defendant Mark Houck*

s/ Peter Breen
PETER BREEN*
THOMAS MORE SOCIETY
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
312-782-1680
pbreen@thomasmoresociety.org
*Attorney for Defendant Mark Houck*

*\* pro hac vice*

## <u>CERTIFICATION OF SERVICE</u>

       BRIAN J. MCMONAGLE, ESQUIRE, hereby certifies that a true and correct copy of the within document has been electronically served.

<u>s/Brian J. McMonagle</u>
BRIAN J. McMONAGLE ESQUIRE
Attorney for Defendant

DATED: 1/16/23

cases brought by the Attorney General of the United States or of a State). The civil penalties may not exceed $15,000 for a first violation, or $25,000 for a subsequent violation. [41]

Those entitled to sue as "aggrieved persons" would include, for example, patients, physicians or clinic staff (or their families subjected to violence, threatened with harm, or physically blocked from entering a clinic, as well as clinics that have been blockaded, invaded, bombed, burned, damaged by chemical attacks or otherwise vandalized. Persons injured in the course of assisting patients or staff in gaining access to a facility, or injured bystanders, may also sue if they can establish that the conduct causing the injury was undertaken with the requisite motive–in order to intimidate some person or class of persons from obtaining or providing abortion-related services. Those with standing as an association representing injured parties would also be entitled to sue to the extent that existing principles of standing permit them to do so.

Attorney General Janet Reno emphasized in her testimony, and the Committee agrees, that both the criminal penalties and the civil remedies are critical features of the legislation. She testified:

The inclusion of both civil and criminal penalties is very important. The civil remedies of injunctions and damages are appropriate as a means of addressing massive blockades. Courts can fashion injunctive relief that will keep **\*27** clinics operating. \*\*\* Damages are important to compensate those individuals who, seeking to exercise their rights, suffer real harm, whether physical or psychological. And the authorization of statutory damages is appropriate to encourage victims to pursue violations and as a deterrent to violators.

Testimony of Attorney General Janet Reno, Senate Labor and Human Resources Committee, May 12, 1993.

Attorney General Reno also emphasized the importance of providing authority for the Attorney general to file civil actions:

[I]t is very important that the Attorney General have authority to file a civil action. This approach follows the model of other statutes protecting individual rights–notably the Fair Housing Act–by shifting the burden of civil enforcement from private victims to the government, which is often better able to pursue such cases and vindicate the enormous interest that our society has in protecting individual rights.

Id. It is for the same reasons that the Act authorizes State Attorneys General to bring civil suits in the same circumstances– where a State Attorney General has reasonable cause to believe that someone is, has been or may be injured by conducting constituting a violation of this Act, and concludes that such conduct raises an issue of general public importance. This provision was recommended by the National Association of Attorneys General (NAAG). See the testimony of New York Attorney General Robert Abrams, Senate Labor and Human Resources Committee, May 12, 1993, and the March 1993 Resolution of NAAG attached to it. [42]

3. Rules of construction

Section 2715(d) sets forth several rules of construction. Subsections 2715 (d)(1) through (d)(4) clarify that the States retain jurisdiction over any offense over which they could have jurisdiction absent this section; that State and local law enforcement authorities retain responsibility to prosecute acts that are violations of State or local law; that the Act does not establish exclusive penalties for conduct that may violate it; and that the Act does not limit the right of an aggrieved person to seek other civil remedies. This provision makes clear that the Act does not preempt a State or local law regulating the performance of abortions or the availability of abortion-related services.

In addition, subsection 2715(d)(5) makes clear that nothing in the Act is intended to prohibit expression protected by the First Amendment to the Constitution.

In short, this legislation will not penalize a point of view. It will not penalize conduct expressing that point of view in nonviolent, nonobstructive ways.

The only conduct it prohibits is violent or obstructive conduct that is far outside any constitutional protection. That is why the measure has been unequivocally endorsed by the American Civil Liberties Union and many others who have reviewed its constitutional implications.

Some may wonder why we need a Federal law, since such activities are normally a matter for State and local authorities. State and local laws against trespass, vandalism, assault and homicide, cover a large part of the conduct this legislation would address.

But in a number of incidents around the country, local officials, apparently opponents of abortion rights themselves, have been unwilling to enforce the laws. A sheriff in Texas has stated unequivocally that he will not enforce the law against those seeking to stop abortions. A police chief in Minnesota was arrested for participating in a clinic invasion himself.

A Federal law is also needed because we are confronted with a nationwide pattern of conduct by persons and organizations who operate across State lines in a manner that often makes it difficult or impossible for local authorities to respond effectively. Anti-abortion activities of the most extreme kind have been reported in every part of the United States. When the organizers and their recruits move from one clinic to another in different jurisdictions, Federal investigative and law enforcement resources are essential.

Local authorities are often overwhelmed by the sheer numbers of clinic attackers. The Falls Church, VA, official who testified to the Labor Committee told us that his town had only 30 uniformed officers to arrest over 200 clinic attackers. It took hours for the police to clear the clinic. The lone city prosecutor handling the charges was swamped, and ultimately the trial had to be held in the community gym, because it was the only place large enough.

Clearly, these cases should be Federal cases.

Prior to the Supreme Court's decision in Bray versus Alexandria Health Clinic last January, in circumstances like this the clinic operators, staff or patients could apply to Federal court for an injunction, which could then be enforced by U.S. marshals.

For example, in the campaign against several clinics in Wichita in the summer of 1991, it was the Federal marshals who were able to restore order. But in Bray, the Court held that the civil rights law under which such injunctions had been issued does not apply to antiabortion blockades. That decision created an unfortunate gap in the Federal laws that this legislation will close.

Attorney General Reno, with her background in local law enforcement and her special sensitivity to the appropriate roles of Federal and local authorities, wholeheartedly concurs in the need for Federal help here. In fact, she testified that enactment of this legislation is one of the Justice Department's top priorities.

Some have asked why the bill singles out abortion-related violence and blockades. The answer is that this legislation singles out for new Federal penalties and remedies exactly the conduct that calls for a Federal response—no more, no less. Antiabortion violence and blockades have been occurring across the Nation as part of a coordinated, systematic campaign to intimidate abortion providers and patients, and State and local authorities have been unable to control it.

Nothing remotely comparable is happening that would justify a Federal law against violent demonstrations in other contexts. There is no record of any organized, nationwide pattern of violence or blockades by labor unions or any other group, let alone a pattern of conduct that local authorities have been unable to handle.

When a need for Federal legislation is shown, Congress should act. Last year we passed by voice vote a law prohibiting violence against animal research facilities. No one objected on the ground that it singled out animal research opponents unfairly.

Finally, S. 636 evenhandedly addresses the possibility of abuses by both sides of the abortion controversy. It provides exactly the same protection for pro-life counseling centers, staff, and clients that it provides for abortion clinics and their staff or clients. It does so by applying its prohibitions to conduct aimed at interfering with pregnancy or abortion-related services, and defining that term to include services relating to pregnancy or the termination of a pregnancy.

If abortion rights activists were to vandalize a pro-life counseling center, or use force against a counselor who works there, they would be subject to the same criminal and civil liability as pro-life activists who attack abortion clinics or use force against a doctor who works there.

This provision was added to S. 636 in the Labor Committee to respond to the desire for equal treatment of both sides. The even-handedness principle is further refined in the modified substitute I offer today. At the request of Senator WOFFORD, we have changed the name of the services covered from "abortion-related" to "pregnancy or abortion-related," to make it even clearer that pro-life pregnancy counseling is included in its protections.

In addition, as a further modification after discussions with Senators DURENBERGER and KASSEBAUM, the bill ensures that demonstrators—whichever side of the abortion debate they are on—do not obtain any right under this law to bring a civil suit. Only patients

and clinic personnel will have that right.

As reported by the Labor Committee, S. 636 permitted any person aggrieved by the prohibited conduct to sue for damages or injunctive relief. That could have been read to permit suits against clinic attackers to be brought not only by a patient or doctor or clinic owner, but also by a pro-choice demonstrator or clinic defender. Pro-life demonstrators outside the same clinic would not have had a similar right to such relief.

As modified, the bill restores the evenhandedness principle. It permits suits only by persons involved in providing or obtaining services in the facility. If demonstrators outside a clinic engage in pushing, shoving, or other forceful conduct against each other, neither side can sue under this law.

This measure, in short, provides fair, evenhanded treatment for all concerned. It is urgently needed. It is not enough for Congress to condemn the violence.

We must act before more doctors are killed, or more clinics are blockaded or burned to the ground.

Law enforcement officials at all levels of government agree, including Attorney General Reno, who testified in strong support of this legislation. The consensus includes the State attorneys general, who adopted a unanimous resolution urging Congress to pass this law. It includes local officials throughout the country who need this Federal help.

All of the leading women's rights groups and groups concerned with women's reproductive health regard this measure as a top priority.

Health care providers, too, have joined in calling for passage of this legislation. The American Medical Association has endorsed it, and so has the American College of Obstetricians and Gynecologists. Their view is clear—no doctor should be forced to go to work in a bulletproof vest.

In addition, the respected British medical journal, the Lancet, in an editorial in its October 16, 1993 issue, addressed this issue in American medicine and stated, "Congress should act soon to end this terrorism."

The Senate should act, and act now. This measure has bipartisan support from Senators who are pro-choice and Senators who are pro-life. We may not agree on the issue of abortion, but we do agree that the use of violence by either side to advance its views is wrong.

I urge the Senate to pass this legislation.

### PRIVILEGE OF THE FLOOR

Mr. KENNEDY. Mr. President, I ask unanimous consent that Lucy Koh, a fellow in my office, be afforded floor privileges.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

tee the right to choose can be exercised.

Mr. DURENBERGER. Before we vote on this bill, I have some questions about the operative language, contained in section 2715(a).

My purpose in offering these questions to the chief sponsor of this legislation is to clarify what activities will be allowed and which will be prohibited if this legislation becomes law.

My understanding is that facilities covered by this legislation include both those facilities providing abortion-related services or other pregnancy-related medical services to women and pro-life counseling centers or so-called pro-life crisis centers. Is that correct?

Mr. KENNEDY. Yes, that is correct. The bill is even-handed in that it protects both those facilities providing abortions or abortion counseling and those that counsel women not to terminate their pregnancy. I should also point out that a significant number of patients at clinics providing abortions are seeking medical attention—such as pap smears, birth control, and so forth—that are entirely unrelated to the termination of a pregnancy. These patients are protected too.

Mr. DURENBERGER. I thank my colleague for that response.

My understanding is that, under this bill, a person or group of people could not physically block access to a facility that provides abortion-related services or pro-life counseling services. Is that correct?

Mr. KENNEDY. That is correct. The bill prohibits physical obstruction, which is defined to mean rendering ingress to or egress from the facility impassable, or unreasonably difficult or hazardous. Blockades and invasions of facilities that block access obviously are prohibited by this language. Human gauntlets that impede access are also prohibited. Other examples include pouring glue into locks, chaining people and cars to entrances, strewing nails on areas leading to doors, and blocking entrances with immobilized cars.

Mr. DURENBERGER. I also understand this bill would not interfere with constitutionally protected rights of free speech and lawful assembly.

Mr. KENNEDY. That is correct. The conduct that this bill prohbits—acts and threats of force, physical obstruction, and damage or destruction of property—is not constitutionally protected. Activities that are protected by the first amendment—peaceful expression of views in nonthreatening, nonobstructive ways—are not restricted by this legislation.

Mr. DURENBERGER. As I understand it, under this bill, pro-life protestors gathering outside a medical facility could picket, pray, chant, wail, yell, sing, hold signs, wave banners, hand out pamphlets, sidewalk counsel and carry on similar activities protected by the first amendment. That would all be perfectly legal. They could

not be sued or be subject to criminal penalties for that activity.

Mr. KENNEDY. That is right. As long as those activities did not threaten force or physically block access to the facility.

Mr. DURENBERGER. Would it be allowable under this bill for a group of pro-life protesters to sit down in the path of people trying to get into a facility?

Mr. KENNEDY. They could, as long as they were not physically obstructing the entrance. If a patient is forced to walk over strewn bodies, for example, ingress could well become unreasonably difficult or even hazardous, in which case there would be a prohibited physical obstruction. On the other hand, ingress and egress would not be considered "unreasonably difficult or hazardous" if people trying to enter or leave a facility could easily get past protesters who may be sitting in the sidewalk approaching a clinic entrance.

Mr. DURENBERGER. Under this bill, you define "intimidate" to mean placing a person "in reasonable apprehension of bodily harm." Is that definition meant to encompass emotional damages?

Mr. KENNEDY. "Bodily harm" as used in the definition of intimidate is intended to have the same meaning that is given in other Federal laws, such as 18 U.S.C. 1365: "a cut, abrasion, bruise, burn, or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ or mental faculty; or any other injury to the body, no matter how temporary." These are not the only kinds of injuries that are compensable under the law, however. If a use or threat of force or a physical obstruction intended to injure, intimidate, or interfere with a patient or provider causes purely emotional injury, for example, that injury would be compensable. For example, if someone fires a weapon at a doctor but misses, the doctor could recover if he could prove that he had suffered an emotional injury. On the other hand, conduct that is not prohibited by this legislation, but that nonetheless upsets someone—for example, nonobstructive sidewalk counseling, taunts of "baby killer," holding up disturbing photographs—could not result in criminal or civil liability.

Mr. DURENBERGER. So, in the latter example, the individual who was upset by a taunt or a photograph or some other legitimate exercise of First Amendment expression could not obtain damages for emotional distress?

Mr. KENNEDY. That is correct.

Mr. DURENBERGER. I also have two questions about the new language contained section 2715(c) of the bill. I understand that that language limits those that may bring lawsuits under this bill to persons involved in obtaining or providing or seeking to obtain or provide pregnancy or abortion-related services.

Mr. KENNEDY. That is right. Before this modification was made, there was no limitation on who might have a private cause of action under S. 636. In fact, that language was broad enough to cover protesters. Now, only those involved in obtaining or providing services have a private right of action under subsection (a)(1).

Mr. DURENBERGER. By defining "aggrieved person" in this way, was it your intention to exclude clinic escorts or so-called clinic defenders?

Mr. KENNEDY. That is correct. Demonstrators, clinic defenders, escorts, and other persons not involved in obtaining or providing services in the facility may not bring such a cause of action.

Mr. DURENBERGER. I thank my colleague for his responses.

Mr. FEINGOLD. Madam President, I rise to speak in support of S. 636 which would ensure freedom of access to clinics while protecting the right to peacefully demonstrate.

Although some of my colleagues might want to characterize this issue as solely about abortion, it most certainly is not. It is primarily a response to a nationwide pattern of violence that ranges from murder and woundings to bombings, arson, chemical attacks, and other vandalism. Local authorities have either been unable, or in some cases, unwilling to curb this spread of violence, and it is the responsibility of the Federal Government to step in now to help ensure that women seeking to exercise their constitutional right to an abortion are not denied access to clinics which provide these services.

The violent crimes I speak of are systematically directed as denying women their constitutionally protected right to choose, and are not unlike the pattern of violence we witnessed during the civil rights unrest of the 1960's.

In fact, Attorney General Janet Reno recently said the following in providing testimony on this legislation:

The reluctance of local authorities to protect the rights of individuals provides a powerful justification for the enactment of federal protections that has been invoked previously by congress in passing laws to protect civil rights.

Just as our current circumstances closely parallel those of the 1960's the legislation we are now considering is patterned after civil rights legislation from that time—the voting rights act of 1965.

Madam President, I would like to take a moment to talk about the kinds of violence I have seen take place in my home State.

At least two recent Milwaukee Journal articles outlined the incidents which have occurred at Wisconsin clinics or to Wisconsin abortion providers in 1993. According to these articles:

Bullets were fired into one clinic on four separate occasions;

A Wisconsin doctor received a letter saying the anonymous writer would

The PRESIDING OFFICER. The yeas and nays are requested. Is there a sufficient second?

There is a sufficient second.

The yeas and nays are ordered.

The PRESIDING OFFICER. The Senator from Indiana is recognized.

The Senator yields the floor.

The Senator from Minnesota seeks recognition?

Mr. DURENBERGER. Mr. President, I rise to offer my support for the bill offered by my colleague from Massachusetts, and if I may to respond to the statement made by my dear friend and colleague from Indiana right near the end of his comments before he introduced his amendment, and that is why would anyone on either side oppose this particular amendment.

Mr. KENNEDY. Mr. President, I yield 10 minutes of my time to the Senator from Minnesota.

The PRESIDING OFFICER. The Senator is recognized for 10 minutes.

Mr. DURENBERGER. I thank my colleague.

Mr. President, some are characterizing the legislation before us as an abortion bill. I can sort of tell from some of the lobbyists lined up out in the corridors as we are coming to and from these votes that is a characteristic. A lot of them are trying to line this up between prochoicers and prolifers, as we characterize them in political terms.

But having been through this now for a year, I must say I do not share that view. In its earlier versions, the case could be made that this bill took sides in that controversy, but the bill that we are voting on today does not. I view this bill as an attempt by the Congress and the Nation to endorse an old-fashioned notion, one might call it, of civility in our national debates. Call it what you will, civility or nonviolence or respect for human dignity, it is something that is too often lacking in our society.

Ask anyone who has been in Washington as long as I have or ask the good people who engage in peaceful protest, and they will tell you that in Washington or in our political campaigns or in demonstrations across this country, we are witnessing the deterioration of legitimate debate into mean-spirited attacks and sometimes physical confrontation.

In the abortion controversy, a minority of activists on both sides have engaged in an increasingly violent, and I would say increasingly dangerous, form of protest. The fundamental right of a people to express themselves in peaceful protest is constitutional. We must protect the rights of every citizen to live in this country and to go about their business without fear for their personal safety.

While the bill does not address the deep moral and constitutional conflict in this country about abortion, it does declare it is our policy that this conflict will be addressed by peaceful, civil, and nonviolent means.

I supported the passage of S. 636 in the form it was voted out of the committee, but I voted for it at the time in the hope and, as the chairman knows, with the expectation that it would be improved subsequently. The chairman has, indeed, made every effort since that time to make this a bill which needs and deserves all of our support and without amendment.

Let me outline some of the ways in which Senator KENNEDY has improved the bill. We were concerned that the bill might be constitutionally "overbroad" under the first amendment, that it might be held void for vagueness, as they say, by the courts. To address this concern, they have added in relatively strict definitions for some of the key terms in the bill.

The words "physical obstruction" are now defined as making access to or from a medical facility impassable, unreasonably difficult, or hazardous. The word "intimidate" means to place a person in reasonable apprehension of bodily harm, and the words "interfere with" mean to restrict a person's freedom of movement.

These definitions mean that the bill makes specific acts illegal. It is not an assault on anyone's speech or self-expression on the issue of abortion. In fact, the legislation now states expressly, it shall not be construed or interpreted to "prohibit expression protected by the first amendment of the Constitution."

My colleague from Massachusetts has also added a section that provides legal protection for parents and legal guardians. Under this amendment, parents and guardians cannot face legal penalties for counseling their children not to have an abortion.

Some were concerned that the initial legislation was not even-handed. It looked like a pro-choice bill, pure and simple, and I was one of these people.

To respond to this concern, Senator KENNEDY has broadened the definition of "abortion-related services" to include "pregnancy and abortion-related services." Now the bill not only protects facilities that perform abortions but also those that provide a broad range of health and pregnancy-related services, including counseling about adoption and other alternatives to abortion.

The Senator also deleted a section that would have given the Secretary of HHS broad investigative power to determine whether the provisions of S. 636 had been violated and, where appropriate, to refer the matter to the Attorney General for civil action.

And now to the point. Most significantly, this bill now allows only clinic patients and personnel to obtain legal relief. Only clinic patients and personnel are entitled to obtain legal relief. This change makes it clear that people outside a facility who are there for ideological reasons, pro or against the abortion, as we saw all summer long during the exercise of Operation Rescue in Minneapolis and St. Paul, do not

have a private right of action under the law.

This is the issue raised by the amendment of my dear colleague from Indiana. During the committee markup, I voted for an amendment just like it because, as drafted then, protesters who were at the clinic because they felt strongly against abortion and wanted to express that could be arrested potentially for their protest. But somebody who showed up on the other side, on the other side of the street, to protest the protesters and to express their views could not be. And I supported the amendment by my colleague from Indiana because it evened out the treatment. It made it more balanced.

At that time the bill, as drafted, would allow pro-choice protesters, those protecting the right of entrants, or the demonstrating, if you will, against the other demonstrators, a private right of action under private law.

What the bill now does, because of the modifications that were worked out after the bill left the committee, is to take away that private right or course of action under Federal law. Now there is no need to extend that same right to pro-life protesters or demonstrators. The bill, as currently drafted before us, allows legal relief only to clinic patients and personnel. And this is the critical, if you will—not the only, but the critical—change that has been agreed to by the proponents of this legislation and by the Senator from Massachusetts.

We have recognized that Federal law should be extended narrowly to protect only those who were actually attempting to obtain or provide medical or counseling services. It does not protect the escorts. It does not protect the antidemonstrators, if you will.

I am convinced now, Mr. President, that this legislation strikes the right balance between protecting clinic patients and protecting the legitimate rights of clinic protesters. No one will be jailed for gathering in front of a clinic picketing, praying, chanting, shouting, holding signs, waving banners, or sidewalk counseling. That would all be perfectly legal under this bill.

The legislation has been greatly improved. It is a serious solution to a real problem of clinic violence which many of us have experienced in our communities. The Supreme Court has consistently held for over two decades now that the right to terminate a pregnancy is protected by the U.S. Constitution. I have voted many, many times to change that constitutional interpretation. But it remains the law of the land.

I cannot stand here and condone the harassment, violence, and blockades against women and doctors who are exercising, or attempting to exercise their constitutional right, even though I may disagree with them.

I firmly believe that violence in the name of a cause accomplishes little more than to damage that cause. We

let us work together to address the causes of abortion in order to remove the need for protests and blockades and to make abortion a moot issue.

Madam President, let me also say until we begin to talk about contraception and the perfectability of contraception and medical research, until we begin to talk about sex education in our schools and elsewhere, we are still dealing with only the results that force women into actions of abortion.

Mr. HATCH. Madam President, I have been informed that I need to yield 5 minutes to the distinguished Senator from New Hampshire. I believe he will be the last to speak on our side.

The PRESIDING OFFICER. The Senator from New Hampshire.

Mr. SMITH. Madam President, the debate today, unfortunately, has gotten off the focus. All of us who have spoken out on this bill are supportive of what Senator KENNEDY has in his legislation regarding violence. But we are not talking about violence in some of the examples we have seen here. We are talking about nonviolence.

You would think that all of the people who have been out there in the prolife movement and have protested against abortion clinics were murderers and violent criminals, to hear the debate. Unfortunately, though, there has not been a lot of focus on some of the comments that have been made by those on the other side.

I have here with me a copy of a booklet called "Clinic Defense, A Model, First Edition," March 1990, which was published by the Bay Area Coalition Against Operation Rescue. It might be interesting to hear some of their comments.

Here is their basic philosophy:

Our philosophy is that our first line of defense for protection of reproductive rights is self defense. We cannot rely on courts, police or legislators to protect our fundamental rights to control our bodies and reproductive options.

We have heard that many organizations tell people not to "touch" Operation Rescue, but this, of course, is not really clinic defense.

We are prepared to pick 'em up and move 'em out. This can be done in a concerted way, using several or all of us at a time, to maximize effectiveness, and to minimize danger to individual defenders from police.* * *

Work with defenders around you to focus on a person or persons who need to be removed; identify them, and push the Operation Rescue out from one defender to the next until they are put out of the defense line.

Listen to this:

Rescuers have an inordinate sense of modesty and "honor" about being accused of touching women. There are innumerable instances of clinic defenders neutralizing male OR's by shouting, "get your hands off me, don't you dare touch me" all the while they are tugging or pushing Operation Rescue out of the line.

These are the tactics coming from the other side—and that is not everybody, and I do not imply that it is everybody. It even gets worse. I quote

again from the booklet, which reads as follows:

Clinic Escorting. As Operation Rescue has shifted to picketing and blockading, we've learned that we can't relax and just let them "just" picket.

Mr. President, I ask unanimous consent that this document be printed in the RECORD, because it speaks for itself.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

[Bay Area Coalition Against Operation Rescue (BACAOR)]

### CLINIC DEFENSE: A MODEL

#### BACAOR STRATEGY

Our philosophy is that our first line of defense for protection of reproductive rights is self defense. We cannot rely on courts, police or legislatures to protect our fundamental rights to control our bodies and reproductive options.

#### CLINIC DEFENSE TACTICS

We have heard that many organizations tell people not to "touch" OR [Operation Rescue], but this of course is not really clinic defense.

We are prepared to pick em up and move em out. This can be done in a concerted way, using several or all of us at a time, to maximize effectiveness, and to minimize danger to individual defenders from police, OR, or OR cameras.

Work with defenders around you to focus on a person or persons who need to be removed, identify them, and push the OR out from one defender to the next until they are put out of the defense line.

[Rescuers] have an inordinate sense of modesty and "honor" about being accused of touching women. There are innumerable instances of clinic defenders neutralizing male OR's by shouting "get your hands off me, don't you dare touch me" all the while they are tugging or pushing OR out of the line.

#### THE POLICE

We do not call police ourselves during a hit. Our best work is done before police arrive, or when there are not enough police there to prevent us from doing what we have to do. Get in place before cops can mess with it; establish balance of power early, do key acts requiring physical contact with OR as much as possible before cops have enough people to intervene.

Try to keep them out of it. If they are cruising by, wave them on. Be a voice of authority and reason; let them know we have it all under control and everything is just fine, thank you, officer. (Another good argument for official vests or shirts is that it gives us a tremendous amount of authority.)

#### CLINIC ESCORTING

As OR has shifted to picketing more than blockading, we've learned that we can't relax and let them "just" picket. It's critical to keep pushing, to not lend any legitimacy to their harassment of women on any level. As much as we can, we are drawing lines, saying, no, you cannot picket on the sidewalk in front of the clinic; this is our territory. Go across the street, go away, go wherever—but as far away from the clients as is possible to assert. Even if the sidewalk is "public," we've had success at putting enough of us out, early enough, to basically bully the ORs into staying across the street.

#### OR DOGGERS

We assign one or two escorts to be with [sidewalk counselors] at all times—one on one if we can. These "doggers" are there to focus on and engage the OR, and to place

ourselves physically between them and the client. We may use handheld cardboard signs * * * to put up a visual block between the OR and a client.

There are also the marchers * * * who walk around in small groups, pray and harass women from the periphery * * * We assign several escorts per group of these ORs—the object is to round them up and neutralize them.

#### TACTICS WITH THE ORS

The way people cope with the ORs when there is not a client present runs the gamut from having long philosophical conversations to doing sexual and religious baiting. * * * Having explicitly sexual conversations can really make an anti uncomfortable without directly engaging him. Singing "Goddess" songs while they do their Hail Marys is a lovely way to affirm an alternative view of appropriate religious activities.

Isolate and Humiliate. It is critical to separate in some way the resident OR leader or troublemakers. We assign them a particular escort and do our best to isolate them from the others by getting them to lose their cool, look foolish, argue with us, etc. Although in general sexual jokes or extreme harassment are not useful with the OR picketers (they tend to settle right into martyrdom) if baiting an OR about his treatment of women, his sexuality, and how many times he masturbates will keep him from bothering clients and from being able to effectively direct the others, do it.

Remember, we are under no obligation to be polite to these people. They are here to harass women and torment them, and so matter how nice they are to you, that agenda doesn't change. They have already broken Miss Manners code by being at the clinic at all—don't let them think they can make up for it by being "polite."

#### TEMPORARY RESTRAINING ORDERS

A Temporary Restraining Order (TRO) is a legal device currently in use by several clinics across the country. * * * One example of a TRO's application to certain situations is to prevent a picketer from walking or standing in a given area. This is useful when the sidewalk area fronts the clinic closely, and a "legal" moving sidewalk picket by OR in that area would legally allow OR to get very close to incoming clients. Some clinics have been successful in getting the court to authorize a "free zone," such as a 5-foot wide space from a clinic entrance to the street where picketers are prohibited from stepping. One clinic obtained a TRO to keep picketers out of a private parking lot. Restraining picketers from approaching the client's cars has also been granted.

We believe the clinics are not a legitimate forum for anti-abortion harassment, and it is not a "free speech" issue. Of course in some instances, a TRO may act as a deterrent to picketers and reduce their presence or effect at the clinic, but in cases where determined groups of OR have made it clear they will be there every single week, the struggle to abide by the arbitrary "rules" set forth by a TRO can be prohibitive of other tactics escorts may need to effectively keep OR at bay.

Mr. SMITH. I will conclude my portion of the debate, since I have been here engaging in it since 8 o'clock this morning.

To sum up, Mr. President, there are five reasons why S. 636 should be defeated. First, it is extreme. Second, it sets a terrible precedent. Third, it is vague. Fourth, it is hypocritical. And fifth, it is unconstitutional.

would alter any established rules governing standing. Thus, associations representing aggrieved persons or classes of persons would only be entitled to sue to the extent that existing principles of standing permit them to do so.

### Subsection 248(d)

Subsection 248(d) clearly states that nothing in the act shall be construed to prohibit any expressive conduct, including peaceful picketing or other peaceful demonstration, that is protected from legal prohibition by the First Amendment.

### Subsection 248(e)

Subsection 248(e) makes clear that the Act is not meant to preempt either State legislation or action with regard to reproductive **\*711** health, nor to limit the remedies that may be sought by individuals aggrieved by the prohibited conduct under State law.

### Subsection 248(f)

Subsection 248(f) provides definitions of terms used in the bill. The bill defines "reproductive health services" in Section 248(f)(1) to include all medical, surgical, counseling or referral services that relate to the human reproductive system. These services must be rendered in a hospital, clinic, physician's office, or other facility.

The definition of reproductive health services is meant to encompass pregnancy counseling and support services as well as abortion counseling and procedures, routine gynecological exams, and counseling and medical care regarding contraception, venereal disease, and other aspects of human reproduction. Thus, attacks against clinics or providers of abortion alternatives would be covered, as would attacks against clinics and providers of abortion.

Although the definition of reproductive health services may include teen pregnancy counseling done at school-based clinics, this definition is not meant to encompass mere sex education classes nor is this definition meant to extend to the distribution of literature, drugs, devices or products not done in conjunction with medical, surgical, counseling or referral services relating to human reproduction.

Subsection 248(f)(2) defines the term "facility" to include the building or structure in which the office or clinic is located. Thus the Act would cover a blockade that physically obstructed the entrance to a larger office building or medical complex in which a smaller abortion clinic or pregnancy counseling center is located.

Subsection 248(f)(3) defines "physical obstruction" as activity that would render ingress to or egress from a facility providing reproductive health services[23] impassable or unreasonably difficult.

### SECTION THREE

Section 3 of the bill sets the effective date of the bill as the date of enactment. It expressly applies only to conduct occurring on or after such date.

### SECTION FOUR

Section 4 amends the table of sections of Chapter 13 of title 18 to include new Section 248.